## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-CIV-60114 -RUIZ/STRAUSS

**FUTURE METALS LLC**,

    Plaintiff,

v.

**FRANK RUGGIERO**,

    Defendant.

_____/

### REPORT AND RECOMMENDATION

**THIS CAUSE** comes before me upon Plaintiff's Renewed and Expedited Motion for Temporary Restraining Order [("TRO")] and Preliminary Injunction ("Motion for TRO"). (DE 21).[1] The District Court has referred the case to me for rulings on all pre-trial, non-dispositive matters and for issuance of a Report and Recommendation on any dispositive matters. (DE 24). I have reviewed the Motion for TRO and the record in this case. In addition, I held a hearing on the Motion for TRO on March 24, 2021 ("March 24 Hearing") and heard oral argument pertaining to the motion.[2] (DE 32). Being otherwise duly advised, I respectfully **RECOMMEND** that the

---

[1] The motion is for both a TRO and a preliminary injunction; however, only the motion for a TRO was docketed in CM/ECF. As explained *infra*, the relief recommended by this report is considered preliminary injunction relief; however, this report specifically addresses the request for a TRO. Accordingly, the Clerk is ordered to correct CM/ECF to reflect both the motion for a TRO and the motion for a preliminary injunction. The motion for a preliminary injunction ("Motion for Preliminary Injunction") (DE 21) will remain pending and will be addressed following an evidentiary hearing that the parties agreed to hold on June 2, 2021.

[2] Defendant has agreed (DE 37 at ¶3) to a continuation of the Order Issuing Temporary Restraining Order and Preliminary Injunction by Consent ("Stipulated Order") (DE 18). As discussed *infra*, Plaintiff's Motion for TRO requests both a continuation of the Stipulated Order and seeks a modification of the Stipulated Order to impose greater restraints – specifically, to enjoin Defendant from working for his present employer or from any competitor of Plaintiff. (DE 21 at 20; DE 21-

Motion for TRO (DE 21) be **GRANTED IN PART and DENIED IN PART** for the reasons stated herein.

## BACKGROUND

I.   **Procedural History**

The parties' dispute arises from Defendant's employment with Plaintiff and subsequent voluntary resignation from that employment to work for its allegedly most significant direct competitor (the "Competitor").   (DE 1 at ¶¶34-35, 44).   Plaintiff filed a six-count Verified Complaint ("Complaint") on January 15, 2021, alleging the following causes of action:

> Count I – Misappropriate of Trade Secrets Pursuant to the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*;
>
> Count II – Violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C);
>
> Count III – Misappropriation of Trade Secrets in Violation of Pennsylvania's Uniform Trade Secrets Act ("PUTSA"), 12 Pa. C.S.A., § 5301, *et seq.*;
>
> Count IV – Misappropriation of Trade Secrets in Violation of Florida's Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.002;
>
> Count V – Breach of the Confidentiality Agreement; and
>
> Count VI – Breach of Fiduciary Duty/Duty of Loyalty.

(DE 1).   Plaintiff filed Plaintiff's Expedited Motion for Temporary Restraining Order and Preliminary Injunction ("First Motion") on January 19, 2021.  (DE 5).  The District Court ordered

---

4).  To the extent that Plaintiff seeks greater restraints upon Defendant to which Defendant does not agree, I construe Plaintiff's Motion for TRO as a motion to modify the Stipulated Order.  To the extent that Plaintiff seeks a continuation of the Stipulated Order, I construe the motion to be a consent motion.  Nonetheless, given the extended period for which the Stipulated Order has been, and may continue to be, in place, I proceed on the basis that any extension of the Stipulated Order as a TRO must comply with requirements for the issuance of a preliminary injunction.

Defendant to file a response on or before January 26, 2021 and ordered Plaintiff to file a reply, if any, by January 29, 2021.  (DE 9).

The District Court then held a status conference on January 22, 2021 regarding the First Motion and ordered Plaintiff to file a report by January 25, 2021 as to the parties' efforts to reach an agreement as to the relief sought.  (DE 15).  Plaintiff's status report (DE 16) filed on January 25, 2021 reported that the parties worked collaboratively to reach an agreement and stated that the Parties would submit a Stipulated Consent Injunction and Order ("Proposed Stipulated Order"). On January 26, 2021, the parties filed a proposed stipulated order.  (DE 17).  The District Court then entered the same day the Stipulated Order, which administratively closed the case.  (DE 18). The Stipulated Order was to remain in effect for forty-five (45) days, following which the parties were directed to file a status report regarding the parties' efforts to resolve the dispute.  (DE 18 at 5).

On March 15, 2021, Plaintiff filed a status report ("March 15 Status Report") (DE 19) and a motion to reopen the case ("Motion to Reopen") (DE 20).  Plaintiff's March 15 Status Report (DE 19) and its Motion to Reopen (DE 20 at ¶6) both stated similar allegations – that Defendant had misappropriated and continued to misappropriate Plaintiff's Confidential Information.  On March 16, 2021, the District Court issued an Order Reopening Case and ordered that Defendant shall file his answer to the Complaint within thirty-five (35) days.  (DE 22).  Plaintiff filed the instant Motion for TRO on March 16, 2021 requesting a temporary restraining order as well as a hearing for its Motion for Preliminary Injunction.  (DE 21; DE 21-4).

II.   **Background and Findings of Fact**

A.   **Background**

i.   **The Complaint**

In its Complaint, Plaintiff alleged that it is in the business of, among other things, selling and supplying aerospace quality metals and materials to the global aircraft manufacturing and maintenance industry for the manufacture of component parts.  (DE 1 at ¶6).  Additionally, Plaintiff alleged that Defendant is a former executive that Plaintiff employed for more than thirteen (13) years who worked in a key sales position. *Id.* at ¶¶19-20.  Defendant voluntarily resigned his position with Plaintiff on January 4, 2021, effective January 15, 2021, after Plaintiff made an announcement in September 2020 that it had elected Mr. John Buckridge to the position of president instead of Defendant.  (DE 1at ¶34; DE 23-1 at ¶5).  Plaintiff learned, after Defendant's resignation, that he had accepted a position with the Competitor in late November 2020 but had continued working for Plaintiff and had continued acquiring confidential information about Plaintiff by participating, among other things, in strategic planning and sales meetings.  (DE 1 at ¶35; DE 23-1 at ¶29).  Plaintiff specifically alleged that, after accepting employment with the Competitor, Defendant attended Plaintiff's week-long corporate strategy and planning meeting in December 2020, saved numerous proprietary documents to his desktop, downloaded to an external storage device confidential information of Plaintiff and sent a business expansion plan to the president of the Competitor that was essentially a plagiarized copy of a plan prepared by Plaintiff's president. *Id.* at ¶¶35(a)-(d).  Among other relief sought, the Complaint requested that "Defendant be temporarily, preliminarily, and permanently enjoined and restrained for a period of time deemed proper by the Court to protect [Plaintiff's] trade secrets, *from directly or indirectly working for* or providing services or information to [the Competitor], any competing business in which he may

have an ownership interest, or any other direct competitor of [Plaintiff]." *Id.* at 21, ¶B (emphasis added). (collectively, "Basic Facts and Requested Relief").

### ii. The Stipulated Order

The Stipulated Order issued by the District Court, on January 26, 2021, stated that Plaintiff is a limited liability company having its principal place of business in Broward County, Florida. (DE 18 at ¶1). The order also stated that Defendant held the position of Executive Vice President of Plaintiff and "had executive level knowledge of and access to Confidential Information of [Plaintiff]." *Id.* at ¶2. Confidential information ("Confidential Information") is defined in the order as:

a. confidential information as to pricing, margins, customer proposals, customer contracts, customer pricing (which is routinely done on a confidential basis), product differentiation, pricing strategies, competitive intelligence, and positioning and bidding strategies;

b. product costs, vendor and customer lists (including key contacts, purchasing preferences, pricing, volume, profitability, performance, and needs);

c. lists of approved components and sources, business and marketing plans, sales figures and other financial information not yet announced or publicly disclosed;

d. marketing plans, strategic plans, business plans, acquisition plans and strategies, costs of products and services, growth and development targets;

e. profitability of various products and services, and internal financial information (including but not limited to from which products/services Future Metals derives its revenue from a customer, what products/services are being provided to a customer, and which products/services are the most profitable);

f. service and product capabilities, functionality, features, and designs, and sourcing strategies to maintain competitive costs;

g. budgets, customer feedback survey information; and supplier pricing, performance and capability assessments;

h.  bids, proposals, presentations, sales pipeline information (including proposals) and information concerning customers and potential customers and their needs and requirements (including but not limited to identity, revenue, volume, profitability as to each product/service and overall, requirements, needs, preferences, concerns, plans, experiences, their feedback on Future Metals, and key contacts and decision-makers) and customer lists and prospects;

i.  confidential contract terms and pricing terms with customers;

j.  new business plans and strategies; and

k.  financial and accounting data, operating costs, cost of goods sold, and credit limits.

*Id.* at ¶6.  The order acknowledged that the parties disputed whether there was a substantial threat and risk of misappropriation of trade secrets and whether Defendant had violated his Confidentiality Agreement with Future Metals based on allegations in the Complaint.  *Id.* at ¶3. Indeed, Defendant maintained that he had not used or disclosed any of Plaintiff's trade secrets or violated any agreement with Plaintiff.  *Id.*  Further, the order stated that the parties stipulated and agreed to the entry of the order on an interim basis to avoid litigation while reserving all rights, claims, and defenses and that the parties would not be prejudiced as a result of the order in the event the matter was further litigated.  *Id.* at ¶4.

In issuing the Stipulated Order, the District Court directed that Defendant would be "enjoined, restrained, and prohibited from directly or indirectly engaging in any of the following conduct":

a)  Using or disclosing to any person any trade secrets and other Confidential Information [as defined in the order], and *from violating the terms of his Confidentiality Agreement*, which [was] attached . . . as Exhibit 1; [and]

b)  *Interfering with or adversely affecting [Plaintiff's] relationships with* (including calling on or soliciting) *any customer or entity with whom Defendant did business or had personal contact in performing duties for [Plaintiff]*.  The restriction in this paragraph . . . is limited to the two-year period immediately following the date Defendant's employment with [Plaintiff] ended.

6

(DE 18 at ¶5(a) and (b)) (emphasis added).  The order also set forth directives requiring Defendant to: "[(1)] immediately preserve and return to [Plaintiff] any Confidential Information of Plaintiff . . .[; (2)] grant [Plaintiff's computer forensics provider] supervised access to [and right to image] all personal computer, external storage devises and/or personal accounts which [Plaintiff's] computer records indicate may have been used to transfer or download [Plaintiff's] documents/electronic information, including but not limited [to] a Seagate storage device, Defendant's iCloud account, Defendant's Google Docs account, and any home or other personal computer or external hard drive/storage device he used on or after October 1, 2020[; and (3)] . . . *preserve* and immediately return to [Plaintiff's counsel] all Confidential Information and property of [Plaintiff] in [Defendant's] possession and control," including *all electronic information pertaining to Plaintiff. Id.* at ¶¶7-9.  The Stipulated Order provided for Plaintiff to file a renewed motion for injunctive relief if necessary after forty-five (45) days. *Id.* at ¶11.

### iii.  __The Motion for TRO__

Plaintiff's Motion for TRO initially seeks to continue the Stipulated Order: "[b]y this Motion, [Plaintiff] seeks a continuation of the current consent injunction . . . until the motion for preliminary injunction is heard."  (DE 21 at 2) (referencing DE 18).  Plaintiff asserts that the Motion for TRO was necessary because Defendant would not agree to extend the Stipulated Order by consent.[3]  *Id.*  Conflictingly, Plaintiff's motion later seeks relief that goes significantly beyond

---

[3] Plaintiff avers that, after informing Defendant on March 12, 2021 that Plaintiff would file the instant motion *if there was no agreement to extend the Stipulated Order*, Defendant would not agree to extend it.  (DE 21 at 2).  Defendant's Status Report filed on March 16, 2021, however, alleged that Plaintiff sent an initial proposal of a Stipulated Consent Injunction and Order on March 10, 2021 that contained provisions that went far beyond the Stipulated Order.  (DE 25 at 1).  Defendant further alleged that he submitted a counterproposal to Plaintiff on March 11, 2021, to which Plaintiff did not respond.  *Id.*

the Stipulated Order.  Specifically, the Motion for TRO attaches a proposed TRO, which includes a provision that enjoins Defendant "[f]rom directly or indirectly working for or providing employment, advice, services or information to [the Competitor], or any other direct competitor of [Plaintiff]."  (DE 21-4 at 3); *see also* DE 21 at 20 (referencing in its request for relief "additional relief" . . . "in accordance with the [proposed TRO]").

The Motion for TRO primarily repeats the Complaint's Basic Facts and Requested Relief but elaborates on them given its further investigation.  The examination of Defendant's computer devices and accounts by Plaintiff's forensics investigator during the forty-five (45) day extension period provided by the Stipulated Order did not produce evidence of Defendant retaining or sharing Plaintiff's Confidential Information since issuance of the Stipulated Order.  The examination did, however, surface evidence that Defendant deleted at least one phone call from his iPhone in violation of the Stipulated Order as more fully discussed below.

In seeking a TRO, Plaintiff posits that "Defendant has the motive, the opportunity and a proven inclination to interfere with [Plaintiff's] relationships with customers and suppliers and provide [the Competitor] with highly confidential, proprietary trade secrets that could damage [Plaintiff's] competitive advantage" and impact the job security of its 100-plus employee base.[4] (DE 21 at 3).  Plaintiff also alleges that Plaintiff engaged in deceitful conduct creating a lack of trust in Defendant's adherence to the terms of his Confidentiality Agreement with Plaintiff. (DE 21 at 8).

---

[4] Plaintiff's Motion for TRO attaches three (3) declarations: the January 18, 2021 Declaration of John Buckridge as Exhibit 1, the Supplemental Declaration of John Buckridge dated March 15, 2021 as Exhibit 2 and the Declaration of Daniel Roffman as Exhibit 3, Plaintiff's forensics investigator ("FI Declaration").  (DE 21 at n.1; DE 21-1; DE 21-2; DE 21-3).  On March 16, 2021, Plaintiff filed a notice of corrected exhibit attaching a revised Exhibit 1 to the Motion for TRO. (DE 23-1).

### 1.  Motive

In support of alleging that Defendant has a motive to breach the Confidentiality Agreement and misappropriate Plaintiff's trade secrets, Plaintiff alleges that Defendant was upset that he was passed over for the position of President with Plaintiff.  (DE 21 at 6; DE 23-1 at ¶5).  Plaintiff's current President, Mr. Buckridge, reported to Defendant for a period of time before being promoted to the position of president with Plaintiff in September 2020.  (DE 23-1 at ¶5).

### 2.  Opportunity

As to opportunity, Plaintiff alleges that it operates in a highly specialized and highly competitive industry with a very limited number of competitors such that "any edge is critical to securing and maintaining business."  (DE 21 at 4-5; DE 23-1 at ¶8).  In particular, Plaintiff alleges that to meet the needs of its customers it maintains an inventory of quality metals and strategically positions warehouses to supply its customers with quality metals on short notice at competitive prices.  (DE 21 a 3-4; DE 23-1 at ¶¶8-12).  As such, Plaintiff alleges that Defendant's executive-level awareness of the Confidential Information of Plaintiff and Defendant's direct contact with key customer accounts and involvement with mill supply negotiations and pricing of raw materials, including pricing that is tied to Plaintiff's contracts with customers, would benefit Defendant in his new position with the Competitor to the detriment of Plaintiff.  (DE 21 at 5-6; DE 23-1 at ¶¶6-18; DE 1 at ¶26).

Plaintiff contends that the opportunity to share Plaintiff's Confidential Information is, in fact, exacerbated by the position that Defendant holds with the Competitor.  Plaintiff alleges that, *after Defendant made the Competitor aware of the Confidentiality Agreement,*[5]  *the Competitor created a position for Defendant* involving developing and implementing a business development strategy to profitably grow the Competitor's aerospace market share globally, which is the *same market* that Defendant dedicated his efforts to while working for Plaintiff.  (DE 21 at 7).

### 3.  Inclination

Regarding inclination to share Confidential Information with the Competitor, Plaintiff alleges several instances of conduct by Defendant in support of Plaintiff's contention.  First, Plaintiff alleges that Defendant shared Confidential Information when he solicited the Competitor for employment and indicated proclivity to further share Confidential Information by promoting his ability to provide "market intelligence" to the Competitor.  Second, Plaintiff alleges that Defendant inappropriately remained working for Plaintiff and garnered even more significant Confidential Information after he accepted a conditional offer of employment with the Competitor.[6]  Third, Plaintiff alleges that Defendant took steps to download and retain Plaintiff's Confidential Information for personal use and interfered with Plaintiff's business relationships while still working for Plaintiff.  (DE 21 at 6-9).

In support of Plaintiff's first contention that Defendant was inclined to, and did share, Confidential Information when pursuing employment with the Competitor in mid-October 2020,

---

[5] On November 3, 2020, Defendant sent a copy of the Confidentiality Agreement to the Competitor and noted that he "ha[d] received guidance from outside council [sic] today on [clauses pertaining to confidential information and non-solicitation/non-interference] and [wanted] to make sure [the Competitor was] fully aware." (DE 21-3 at 77).  As discussed *infra*, I find that this cuts against Plaintiff's argument that Defendant is sharing Confidential Information with the Competitor.

[6] The Competitor's offer of employment was subject to a background check, psychological evaluation and a drug test.  (DE 21-2 at ¶15).

Plaintiff attaches the January 18 Declaration of President John Buckridge (DE 23-1), the March 15 Declaration of President John Buckridge (DE 21-2) and the FI Declaration of its forensics investigator dated March 15, 2021 (DE 21-3). Plaintiff alleges that Defendant shared Confidential Information with the Competitor by including in his resume ("Resume") (DE 21-3 at pp. 53-75) an essentially plagiarized strategic vision for the Competitor and sharing certain confidential financial metrics of Plaintiff. (DE 21 at 6; DE 21-2 at ¶¶9-11; DE 21-3 at ¶¶12-20, pp. 53-75). Plaintiff also cites as evidence Defendant's October 16, 2020 email to the Competitor where Defendant states "I am . . . confident that with my experience and *the market intelligence I can provide* . . . we could maximize this historic opportunity to reposition for even greater success in the future." (DE 21 at 6; DE 21-3 at 65) (emphasis added). With respect to sharing Confidential Information, in particular, Mr. Buckridge attests that Defendant shared Plaintiff's earnings before interest and taxes ("EBIT") and information regarding material margins (a measure of profit over and above the cost of raw materials) ("Material Margins") (collectively, the "Metrics"). (DE 21-2 at ¶¶9-11; DE 21-3 at pp. 53-75). Plaintiff additionally alleges that the source for the Material Margins was a document that Defendant subsequently downloaded to an external storage drive. (DE 21 at 6).

Regarding Plaintiff's second contention that Defendant should not have remained in Plaintiff's employ after committing to work for the Competitor, President Buckridge attests that Plaintiff would have terminated Defendant upon learning of Defendant's acceptance of employment with the Competitor rather than allow Defendant to attend strategic planning meetings and continue accessing Plaintiff's Confidential Information. (DE 23-1 at ¶29). The Motion for TRO footnotes that evidence shows that Defendant expressed concern to the Competitor that he would be released immediately *in advance of his planned start date in mid-January* once he

resigned from Plaintiff, which Plaintiff asserts is indication that Defendant knew he should not continue working for Plaintiff.  (DE 21 at n.3).  President Buckridge also attests that Defendant did not tell Plaintiff that he would be working for the Competitor when he resigned from his position with Plaintiff on January 4, 2021. (DE 23-1 at ¶¶19, 29).  Rather, through technology that recorded screen shots of Defendant's computer, Plaintiff learned that Defendant had accepted a position with the Competitor.  (DE 23-1 at ¶¶30(a)).  On January 6, 2021, Plaintiff placed Defendant on suspension pending investigation.  (DE 21-2 at ¶16).

As to Plaintiff's third contention, Plaintiff proffers various evidence pertaining to Defendant downloading Confidential Information and interfering with Plaintiff's relationships. First, Plaintiff alleges that Defendant engaged in storing Plaintiff's Confidential Information to an external storage device after accepting the Competitor's conditional employment offer on November 30, 2020.  (DE 21 at 7-8; DE 23-1 at ¶30(e), p. 33).  In support, Plaintiff attaches the FI Declaration, which states that Defendant "appear[ed] to have copied more than 2,900 files to [an expansion drive] on December 3, 2020."  (DE 21-3 at ¶14).  The forensic investigator attests that, although many files copied appeared personal in nature, Defendant opened two business files after copying them, namely the "2020 Global Sales Meeting Purchasing (MRO edit for slide 7-8 refresh for the Manager Summit).pptx" ("2020 Global Sales Meeting File") and "SLS.xlsx." ("Sales History File").  (DE 21-3 at ¶14; DE 23-1 at ¶30(e), p. 33).  President Buckridge attests that the Sales History File is a "comprehensive list of all sales for a period covering more than the last ten years by customer and product, and included the gross margin on each type of sale, budgets and goals, product trend data, and sales reports by territory and division."  (DE 21-2 at ¶16).  Thus, Plaintiff alleges that Defendant took these steps to acquire for his personal use the Confidential Information of Plaintiff.

Second, as to Defendant's inclination to interfere with Plaintiff's relationships in violation of the Confidentiality Agreement, Plaintiff alleges that Defendant contacted a key material supplier on January 6, 2021 and had a 30-plus minute call with the supplier, after which the supplier behaved in a manner to indicate that it had confidential information concerning Plaintiff's contract with a key customer.  (DE 21 at 9; DE 21-2 at ¶17).  Further, Plaintiff alleges that a customer with a close, personal relationship with Defendant provided, within the week prior to Defendant's formal resignation, nearly one-year's advance notice that it would be "non-renewing its long term supply contract with [Plaintiff] to go with another provider with 'better pricing.'"  (DE 21 at 8). Plaintiff also alleges that it has encountered unspecified incidents with suppliers pushing unexpectedly for price increases.  (DE 21 at 9).  Additionally, Plaintiff alleges that, subsequent to the Stipulated Order, Defendant announced on Linked-In that he had attended the Competitor's Global Sales meeting, which Plaintiff contends placed Defendant in a position to use and disclose Plaintiff's Confidential Information.  (DE 21 at 9).  Thus, Plaintiff posits that Defendant has demonstrated a proclivity to share Confidential Information with the Competitor.

## 4.  Deceitful Conduct

Moreover, the Motion for TRO argues that Defendant has engaged in deceitful conduct "to cover his tracks."  (DE 21 at 8).  In spite of a demand to preserve evidence from Plaintiff's counsel on January 8, 2021, forensic evidence reflects that Defendant deleted all calls but one from his personal cell phone before the phone was imaged at 5:35 PM on February 3, 2021, including a call that a forensics investigator made to him at 3:30 PM on February 3, 2021.  (DE 21-2 at ¶17; DE 21-3 at ¶18).  The FI Declaration states that "[n]o other call logs were recoverable" and attests to an inability to analyze Defendant's other call logs due to Defendant's deletions.  (DE 21-3 at

¶18).  On this record, Plaintiff has thus established that Defendant deleted one phone call from the forensic investigator in violation of the Stipulated Order.

In addition, Plaintiff's forensic investigation determined that Defendant deleted the Sales History File, along with approximately 50,000 other files, including the 2020 Global Sales Meeting File, from his personal external storage drive on January 8, 2021, "two days after he was suspended pending investigation."  (DE 21-2 at ¶16; DE 21-3 at ¶17).  Plaintiff contends that the timing of Defendant's deletions here is troublesome because they did not occur after he formally announced his resignation but only after Plaintiff suspended Defendant pending investigation.  (DE 21 at 8).  In addition to the aforementioned deletions, Plaintiff's forensic investigator determined that Defendant deleted the entire browsing history on his work computer on January 5, 2021.  (DE 21 at 8-9; DE 21-3 at ¶16).  Plaintiff further alleges that Defendant deleted part of the call history from his work phone, but Defendant has been able to identify calls from billing records, which led to Plaintiff identifying the previously noted 30-plus minute call to a key supplier.  (DE 21 at 8-9).

Plaintiff's Motion for TRO argues that the court may grant an injunction to prevent actual or threatened misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(A)(i) and that Florida, Illinois, and Pennsylvania similarly provide for injunctive relief to prevent actual or threatened misappropriation of trade secrets.[7]  (DE 21 at 9-10).  Plaintiff further argues that the standard for granting a TRO is the same as for an injunction under Fed. R. Civ. P. 65.  (DE 21 at 9-10).

---

[7] Plaintiff argues that the Competitor is headquartered in Pennsylvania, and Defendant has acted on behalf of the Competitor.  (DE 21 at 10, n.8).  Nonetheless, even if true, the Competitor is not a party to this action, and Plaintiff has failed to sufficiently allege that Defendant has acted as an agent of the Competitor.  Therefore, I do not find that Plaintiff has established a basis for Pennsylvania law to apply in this case and do not discuss Pennsylvania law further.

### iv.    **The Hearing**

At the March 24 Hearing, Plaintiff stated in response to inquiry that the Stipulated Order was insufficient to govern Defendant's behavior going forward because Defendant had been less than forthcoming about what he was doing and had been trying to "cover his tracks" by deleting phone calls and documents.  (DE 32).  Plaintiff stated that, on approximately January 6, 2021 (following his resignation), Defendant was informed that he was placed on suspension pending investigation at which time Plaintiff took control of certain equipment.  *Id.*  Defendant began working for the Competitor a couple of days after January 15, 2021, the effective date of his notice to Plaintiff.  *Id.*  When Plaintiff reviewed phone records, they observed that Defendant had forwarded calls (more than 100) to his personal cell phone.  *Id.*  Plaintiff argued that Defendant had previously disclosed Confidential Information to the Competitor, had been mining Confidential Information and had been telling the Competitor that he will use the information to benefit the Competitor (at the expense of Plaintiff) and that courts have enforced the relief requested – to proscribe Defendant's employment with competitors – where there has been misappropriation.  *Id.*

In response to inquiry regarding evidence that Defendant has not abided by the Stipulated Order since it was entered, Plaintiff reported that it does not have evidence of non-compliance since the issuance of the Stipulated Order.  *Id.*  Plaintiff added, however, that there is evidence of phone records being deleted (which impliedly could have demonstrated noncompliance).  *Id.*  Thus, Plaintiff argued that, based upon Defendant's deceitful conduct, there is insufficient trust that Defendant can continue to work for the aerospace industry segment of the Competitor's business without using Plaintiff's Confidential Information to harm Plaintiff.  *Id.*

Defendant responded to Plaintiff's allegations by stating that his counsel is just getting up to speed and was learning for the first time at the March 24 Hearing that Plaintiff wanted to restrain/enjoin Defendant's employment. *Id.* Defendant noted without rebuttal from Plaintiff that there is no non-compete agreement in the instant case. *Id.* Additionally, Defendant argued that Plaintiff has not shown that Defendant is in possession of, or has given (to anyone), Plaintiff's Confidential Information in violation of the Stipulated Order. *Id.* Defendant also argued that Plaintiff has not actually shown, and has only speculated about, any detrimental effect that would warrant preventing Defendant from working at the Competitor. *Id.* With respect to the call forwarding that Plaintiff complained of, Defendant averred that it occurred as a matter of practice prior to exploring employment with the Competitor and was not a nefarious act. *Id.* Defendant also averred that, when he consented to subject his personal phone to examination, he deleted his personal calls because they were personal and involved matters that were personal to him that did not implicate his employment. Defendant stated that he simply did not want to divulge information regarding his personal affairs to Plaintiff. *Id.* Defendant did not specifically address the phone call that he deleted from the forensic investigator. Further, as to the Resume that Defendant provided to the Competitor in mid-October, Defendant disputed that it disclosed Confidential Information. *Id.*

Defendant also argued at the March 24 Hearing that enjoining Defendant's employment with the Competitor is not warranted for a couple of reasons. First, Defendant contends that Plaintiff and the Competitor are very different companies with different business models. *Id.* In particular, Defendant argued that the Competitor provides a lower margin line of products whereas Plaintiff competes in a niche line of products commanding high margins. *Id.* Furthermore, Defendant averred that he is not performing the same job function at the Competitor that he was

performing when employed by Plaintiff.  *Id.*  Defendant also stated that he has twenty-six (26) years in the business and that he worked for the Competitor for several years prior to being employed by Plaintiff.  *Id.*  Defendant thus argued that barring him from employment in the aerospace industry would preclude him from earning a living.  *Id.*  Defendant requested, instead, an opportunity to respond to Plaintiff's allegations, expressed a willingness to continue the existing Stipulated Order and committed to being prepared to proceed in seventy (70) days with a preliminary injunction hearing.  *Id.*

Plaintiff replied that restraining/enjoining Defendant's employment was necessary and supported by governing law.  Plaintiff argued that it was not just arguing Florida law but also Illinois law, which supported restraining Defendant from working for a competitor based upon the inevitable disclosure doctrine.  *Id.*  Plaintiff proffered that it could present by declaration information about several phone calls of more than ten (10) minutes that demonstrate that Defendant had been conducting business presumably to benefit the Competitor rather than for purposes of Defendant's role working for Plaintiff.[8]  *Id.*  Plaintiff emphasized that the longer Defendant works for the Competitor, the more risk there is to Defendant.  *Id.*

Following the Court's inquiry at the March 24 Hearing as to whether a more targeted prohibition on employment than restriction from the entire aerospace industry in which the parties were working would assuage concerns until the parties' agreed-to date for a preliminary injunction hearing, the parties agreed to confer amongst themselves for thirty (30) minutes for the purpose of working out an agreement for a consent injunction.  *Id.*  Following the conferral, Plaintiff reported a belief that the parties agreed to terms over and above the Stipulated Order that would limit

---

[8] The Court understands these calls as having been made prior to issuance of the Stipulated Order.

Defendant's ability to be involved in the sale of existing products that Plaintiff sells and stated that the parties would need to work out the specific verbiage  *Id.*  Defendant stated that he would agree to an extension of the Stipulated Order and to not be involved in selling products that Plaintiff sold based on the fact that he is not in a role that involves sales, including not being involved in bidding, but is in more of an analytical role.  *Id.*  Therefore, I ordered the parties to file a new proposed stipulated order similar in format to the previous Stipulated Order or a Notice of Non-Agreement by March 25, 2021.[9]  (DE 33).

### v.   <u>Notice of Non-Agreement</u>

On March 25, 2021, the parties each filed a Notice of Non-Agreement (DE 36; DE 37). Plaintiff's notice averred that Defendant's counsel advised that Defendant could not agree to any restrictions over and above what was in the Stipulated Order.  (DE 36 at ¶2).  In contrast, Defendant's notice averred that, on March 24, 2021, Plaintiff proposed additional restrictions not part of the restrictive covenants in the Confidentiality Agreement sued upon in this case and that the broad language proposed by Plaintiff could affect Defendant's current employer, the Competitor, who is not a party to this action. (DE 37 at ¶1).  For that reason, Defendant's counsel advised Plaintiff that Defendant could not agree to restrictions beyond the Stipulated Order.  *Id.* at ¶2.

For reasons further discussed below, I do not find that Plaintiff has demonstrated – at this juncture – that Defendant should be enjoined from working for the Competitor "or any other direct competitor" of Plaintiff as the Motion for TRO requests, albeit in a latent manner.  (DE 21-4 at 3).

---

[9] The parties agreed to an evidentiary hearing date of June 2, 2021 pertaining to Plaintiff's motion for a preliminary injunction and to conduct limited discovery in advance of that hearing.  (DE 32). Accordingly, on March 24, 2021, I entered the Order Setting Evidentiary Hearing and Briefing Schedule on Plaintiff's Motion for Preliminary Injunction ("Evidentiary Hearing").  (DE 35).

I conclude, however, that continuation of the Stipulated Order is appropriate.  Further, I set forth herein findings of facts and conclusions of law in support of the continuation of the Stipulated Order under the standards applicable to preliminary injunctions due to the parties' conflicting allegations concerning the history of their agreement or non-agreement about continuing the Stipulated Order and the length of time that an extension will keep the Stipulated Order in effect.

**B.  <u>Findings of Fact</u>**

In support of continuing the Stipulated Order without modification until this Court can conduct the Evidentiary Hearing and rule upon Plaintiff's Motion for a Preliminary Injunction, I make the following findings of fact:

1. Defendant, employed by Plaintiff for more than thirteen (13) years, worked for Plaintiff in a key executive sales position prior to his resignation.  (DE 21 at 4; DE 23 at ¶¶19-20; DE 32).

2. By virtue of his employment with Plaintiff, Defendant acquired knowledge of, and had access to, Confidential Information of Plaintiff as defined in the Stipulated Order.  (DE 18).

3. Defendant has worked in the aerospace industry for more than twenty-five years.  (DE 32).

4. Defendant resigned from his position with Plaintiff on January 4, 2021 giving two weeks' notice.  (DE 23-1 at ¶ 19; DE 32).

5. Plaintiff placed Defendant on suspension on approximately January 6, 2021, pending investigation.  (DE 21-2 at ¶16; DE 32).

6. Defendant left his employment with Plaintiff effective January 15, 2021 and went to work for the Competitor a couple days later.  (DE 32).

7. Plaintiff does not have a noncompete agreement with Defendant.  (DE 32).

8.  Both Plaintiff and the Competitor serve the aerospace industry.  (DE 32).  *See also* DE 21 at 3-7; DE 21-2 at ¶14; DE 21-3 at ¶13, pp. 16-17).

9.  Defendant disputes that the Competitor is a direct competitor of Plaintiff.  (DE 18 at ¶3; DE 32).

10. On March 21, 2019, Defendant executed and delivered a confidentiality agreement ("Confidentiality Agreement") that is referenced in the Stipulated Order and was essentially given continued effect through the Stipulated Order issued on January 26, 2021 by the Court.  (DE 17-1; DE 18).  The Confidentiality Agreement requires Defendant to maintain the confidentiality of, and not use for his own benefit, Plaintiff's Confidential Information.  (DE 17-1 at 2; DE 21 at 5).  Confidential information is defined in the agreement to include "[b]usiness information such as product costs, vendor and customer lists, lists of approved components and sources, unpublished price lists, production schedules, business and marketing plans, sales figures, and other financial information not yet announced or publicly disclosed."  (DE 17-1 at 2).  Other relevant provisions of the Confidentiality Agreement include:

    a.  A choice of law provision stating as follows:

        GOVERNING LAW AND VENUE. This Agreement shall be construed, and the relationship between the parties determined, in accordance with the laws of the State of Illinois, notwithstanding any choice-of-law principle that might dictate a different governing law. Each party irrevocably agrees, consents, and submits to jurisdiction and venue in the federal and state courts located in Cook County, Illinois, *with respect to any dispute arising out of or relating in any way to this Agreement*.  (DE 17-1 at 4; DE 18) (emphasis added).

     b.  A Non-Solicit and Non-Interference provision stating, in relevant part, that "during employment and for a period of two years following the conclusion of employment with the Company, [Defendant] shall not interfere with or adversely affect the Company's relationships with any customer or other entity with which [Defendant] did business or had personal contact in performing duties for the Company." (DE 17-1 at 2; DE 18; DE 23-1 at 14).

     c.  "Company" is defined as Plaintiff's parent company "or any of its direct or indirect subsidiaries." (DE 17-1 at 2; DE 18; DE 21 at 5; DE 23-1 at 14).

11. Plaintiff had evidence at the time it filed the Complaint on January 15, 2021 that Defendant solicited employment from the Competitor in mid-October 2020. (DE 1 at ¶ 35(c)). The solicitation included a Resume that Plaintiff alleges, and Defendant disputes (DE 32), included Confidential Information, specifically:

     a.  A proposed 30/60/90 day plan ("30/60/90 Day Plan") (DE 23-1 at ¶30(c)) for expanding the business of the Competitor in the aerospace industry, which Plaintiff alleges is effectively a plagiarized copy of the plan prepared by Plaintiff's president. (DE 1 at 35(c)).

     b.  The EBIT and Material Margins of the Plaintiff. (DE 21-2 at ¶¶9-11; DE 21-3 at pp. 53-75).

     c.  A Business Development Vision that Plaintiff alleges includes Confidential Information pertaining to Plaintiff's strategic plan. (DE 21-2 at ¶11; DE 21-3 at 72).

12. Plaintiff's evidence pertaining to Defendant's efforts to solicit employment with the Competitor in mid-October 2020 includes that Defendant promoted his ability to provide market intelligence to the Competitor. (DE 21 at 6; DE 21-3 at 65).

13. Plaintiff has evidence that Defendant informed the Competitor before the Competitor offered Defendant a position that he was subject to the Confidentiality Agreement (DE 21 at7). An email chain attached to the FI Declaration includes an email dated November 3, 2020, which reflects as being sent by Defendant to the Competitor and attaches a form of the Confidentiality Agreement and *highlights to the Competitor the Confidentiality*

*Agreement's provisions regarding Confidential Information, non-solicitation and non-interference* as well as remarks that he had consulted counsel regarding those provisions. (DE 21-3 at ¶21, pp. 77-83).

14. Plaintiff has evidence that the Competitor offered Defendant a position ("Position") on November 23, 2020 titled "Director of Global Aerospace Product Development." (DE 21-3 at 16-17). The Position's responsibilities were described at that time[10] to include Defendant being a member of the pricing council of the Competitor and recommending pricing strategies for aerospace products. *Id.* at 17. The Position's performance measurements include market share gain, aerospace product growth and profitable aerospace sales growth. *Id.*

15. Plaintiff had evidence at the time it filed the Complaint that Defendant accepted an executive position with the Competitor "on or about November 30, 2020" that was conditioned upon completing the Competitor's pre-employment protocols. (DE 1 at ¶35(a)).

16. Plaintiff had evidence at the time it filed the Complaint that Defendant had downloaded Confidential Information to his business computer desktop after accepting the Competitor's conditional employment offer on November 30, 2021, which Plaintiff alleged Defendant could have no business justification for doing. (DE 1 ¶35(b)).

17. Plaintiff alleged at the time it filed the Complaint that Defendant printed pricing information for two customers and revenue and margin information of Plaintiff after he submitted his resignation on January 4, 2021. (DE 1 at ¶¶ 19, 35(b), (d)). The subsequent

---

[10] The evidence of Defendant's acceptance of the position on November 30, 2020 does not include a detailed description of the position's responsibilities. (DE 23-1 at ¶20).

FI Declaration attests that "[o]n January 4, 2021, [Defendant] printed an email with the subject [customer pricing information] . . . after [Defendant] *drafted* his resignation letter." (DE 21-3 at ¶15) (emphasis added).  Plaintiff acknowledged subsequent to the Complaint that "Defendant claimed he printed [information about pricing for two specific customers and margin information of Plaintiff] for a specific meeting and shredded it afterwards. Defendant . . . provided [Plaintiff] with shredded documents and maintain[ed] he did not print anything else."  (DE 21 at n.4).

18. Plaintiff's billing records indicate that Defendant made multiple calls to, and had a 30-plus minute call with, a key material supplier of Plaintiff *after Defendant was suspended* on January 6, 2021 pending investigation (the "Call").  (DE 21 at 9; DE 21-2 at ¶16). Since the Call, the key supplier has engaged in behavior suggesting that the supplier had confidential information pertaining to a contract that Plaintiff has with a key customer. (DE 21 at 9).

19. Within the week prior to Defendant's January 4, 2021 resignation, a customer of Plaintiff having a close personal relationship with Defendant notified Plaintiff close to one-year in advance of contract expiration that, due to better pricing from another provider, it would not be renewing its long term supply contract with Plaintiff.  (DE 21 at 8).

20. The Stipulated Order required, *inter alia*, that Defendant would submit for imaging by Plaintiff's forensics investigator personal computer devices and storage accounts, which Plaintiff's records indicated "may have been used to transfer or download" documents and electronic information of Plaintiff.  Furthermore, the Stipulated Order ordered Plaintiff "immediately to preserve . . . all electronic information in his possession or control pertaining to [Plaintiff]."  (DE 18 at ¶8).

21. Plaintiff's forensic investigator determined that Defendant's personal iPhone had "only one phone call in the call log" as of February 3, 2021 and attests that Defendant deleted a call made by the investigator's colleague to Defendant at approximately 3:30 PM on February 3, 2021 before the phone was imaged that day at 5:35 PM.  (DE 21-3 at ¶18).  The deletion of the subject phone call occurred after the Court issued, and in violation of, the Stipulated Order.

22. Plaintiff has forensic evidence to indicate that, on December 3, 2020, Defendant downloaded to an external storage device a 2020 Global Sales Meeting File and a Sales History File containing Confidential Information of Plaintiff.  (DE 21-3 at ¶14; DE 21-2 at ¶16).  Plaintiff's evidence also indicates that, on January 8, 2021, after being placed on suspension pending investigation on January 6, 2021, Defendant deleted approximately 50,000 files from the external storage device, including the 2020 Global Sales Meeting File and the Sales History File.  (DE 21-3 at ¶17; DE 21-2 at ¶16).

23. Plaintiff's investigation pertaining to Defendant's misappropriation of Confidential Information, including examination of forensic evidence, is ongoing.  (DE 23-1 at ¶31; DE 32).

24. As of the March 24 Hearing, Plaintiff's evidence that Defendant violated the Stipulated Order consisted only of its proffer that the forensic investigator determined that, on February 3, 2021, Defendant deleted from his mobile phone a telephone call that the investigator's colleague made to Defendant on that date.  (DE 32; DE 21-3 at ¶18).

25. Defendant has agreed to a continuation of the Stipulated Order "pending the [agreed-to] Evidentiary Hearing on June 2, 2021."  (DE 37).

## LEGAL STANDARD

"[B]oth temporary restraining orders and preliminary injunctions as those terms are used in the Federal Rules of Civil Procedure . . . serve to maintain the status quo until a final decision on a matter can be reached." *United States v. DBB, Inc.*, 180 F.3d 1277, 1282 (11th Cir. 1999); *see also Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (discussing that the focus in maintaining the status quo is on preventing irreparable injury).[11] As the Supreme Court has instructed:

> Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing[,] and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. In light of these considerations, it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

"[A] TRO that is continued beyond the time permissible under Rule 65 should be treated as a preliminary injunction." *Levine v. Comcoa Ltd.*, 70 F.3d 1191, 1193 (11th Cir. 1995) (citing *Sampson v. Murray*, 415 U.S. 61, 87 (1974)); *see also H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 844–45 (7th Cir. 2012) (holding that, "for a TRO to be viable beyond the 28-day mark as a preliminary injunction, the order must comport with the formal requirements for a preliminary injunction"). Rule 65(b)(2) provides, with respect to the issuance of TROs, that:

> Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry--not to exceed 14

---

[11] "In *Bonner v. City of Prichard*, [the Eleventh Circuit] adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981." *Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1310 (11th Cir. 2020) (citing 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc)).

days--that the court sets, unless *before that time* the court, for good cause, extends
it for a like period or *the adverse party consents to a longer extension.* The reasons
for an extension must be entered in the record.

Fed. R. Civ. P. 65(b)(2) (emphasis added).

In addition, "Rule 65(d) requires both a TRO and a preliminary injunction to 'state the
reasons why it issued." *H-D Michigan, LLC*, 695 F.3d at 845; *see also* Fed. R. Civ. Proc.
65(d)(1)(A). "Rule 52(a)(2) requires a statement of findings of fact and conclusions of law for
decisions granting or refusing an 'interlocutory injunction' (a phrase that includes preliminary
injunctions)." *H-D Michigan, LLC*, 695 F.3d at 845; *see also* Fed. R. Civ. Proc. 52(a)(2).

For either a TRO or a preliminary injunction to issue, a moving party must show:

(1) it has a substantial likelihood of success on the merits;

(2) irreparable injury will be suffered unless the injunction issues;

(3) the threatened injury to the movant outweighs whatever damage the proposed
injunction may cause the opposing party; and

(4) if issued, the injunction would not be adverse to the public interest.

*Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26, 1231 (11th Cir. 2005).
Furthermore, "it [is] the plaintiff's burden to introduce sufficient evidence to justify the
preliminary injunction, and the court's . . . action in refusing to modify it must stand or fall in light
of the evidence before it at the time. Subsequent motions to modify the injunction might justify
further evidentiary hearings if they allege changes in the facts." *Canal Auth. of State of Fla. v.
Callaway*, 489 F.2d 567, 578–79 (5th Cir. 1974). In addition, "[a]s a matter of equitable discretion,
a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a
likelihood of success on the merits. Rather, a court must also consider whether the movant has
shown that he is likely to suffer irreparable harm in the absence of preliminary relief, that the
balance of equities tips in his favor, and that an injunction is in the public interest." *Benisek v.*

*Lamone*, 138 S. Ct. 1942, 1943–44 (2018) (internal quotation marks and citations omitted). Moreover, a district court has broad discretion to deny preliminary injunctive relief where "complex issues [exist] that should not be decided without the benefit of a well-developed record." *Allied Veterans of the World, Inc.: Affiliate 67 v. Seminole Cty., Fla.,* 468 F. App'x 922, 923 (11th Cir. 2012).

## CONCLUSIONS OF LAW

I do not find that Plaintiff's requested relief of enjoining Defendant from working for the Competitor or direct competitors is warranted for the reasons stated herein.   Continuing the Stipulated Order, however, is appropriate for reasons that I discuss below.

### I.   Choice of Law

As an initial matter, the parties acknowledge having executed a Confidentiality Agreement that includes a choice of law provision stating that it is governed by Illinois law.  (DE 17-1 at 4; DE 18).  A federal court exercising supplemental jurisdiction over state-law claims applies the choice-of-law rules of the state in which it sits, in this case Florida.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941).  "Under Florida law, contractual choice-of-law provisions are presumptively enforceable." *Viridis Corp. v. TCA Glob. Credit Master Fund, LP*, 721 F. App'x 865, 873 (11th Cir. 2018) (citing *Default Proof Credit Card Sys., Inc. v. Friedland*, 992 So.2d 442, 444 (Fla. 3d DCA 2008)).  A party may rebut this presumption "by showing that a provision contravenes the strong public policy of Florida or is unjust or unreasonable."  *Id.*  "The term "strong public policy" means that the public policy must be sufficiently important that it outweighs the policy protecting freedom of contract." *Walls v. Quick & Reilly, Inc.*, 824 So. 2d 1016, 1018 (Fla. 5th DCA 2002) (citing *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 312 (Fla 2000)).  In addition, Florida Statutes, § 671.105 states that, except for

provisions not applicable here, "when a transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law either of this state or of such other state or nation will govern their rights and duties. Failing such agreement, this code applies to transactions bearing an appropriate relation to this state." Fla. Stat. § 671.105(1). Furthermore, a choice-of-law provision is presumed valid until proven invalid, and a party seeking to avoid its application bears the burden to show why it should not be enforced. *Mazzoni Farms, Inc.*, 761 So. 2d at 311.

Here, I find that Illinois law applies to Plaintiff's breach of contract claim and that Florida law governs Plaintiff's state-law trade secret misappropriation claim. The choice-of-law provision in the Confidentiality Agreement states not only that the agreement is to be construed consistent with the laws of the State of Illinois but also that "the relationship between the parties shall be determined in accordance with the laws of the State of Illinois." The parties' relationship is implicated in both the breach of contract claim and relative to the claim of misappropriation (e.g., is Defendant a competitor?); however, the language does not explicitly extend to "all disputes arising out of or relating to" the Confidentiality Agreement. The parties demonstrated an understanding of this type of broad language because they agreed in the Confidentiality Agreement to submit to federal and state courts located in Cook County, Illinois *with respect to any dispute arising out of or relating in any way* to the agreement. Plaintiff, however, filed suit in this Court, and the parties agreed for purposes of the Stipulated Order that this Court has personal jurisdiction and that venue was proper in this Court. (DE 18). Thus, I conclude that the parties did not express an intent, nor did they agree, in the Confidentiality Agreement to apply Illinois law to every dispute that might touch upon or involve the Confidentiality Agreement. Furthermore, because the parties agreed that Illinois law governs the Confidentiality Agreement and because the parties agreed to

litigate the instant dispute in this Court, I find that this action "bears a reasonable relation to this state and also to [Illinois]."  Accordingly, for purposes of addressing Plaintiff's Motion for TRO, I conclude that Illinois law applies to the breach of contract claim and that Plaintiff properly brings a trade secret misappropriation claim under Florida's Uniform Trade Secrets Act, Fla. Stat. § 688.002.

## II.   <u>Preliminary Injunction Factors</u>

Plaintiff's Motion for TRO does not address its breach of fiduciary duty and computer fraud and abuse claims.  Therefore, I limit my analysis to Plaintiff's breach of contract and misappropriation of trade secrets claims.

### A.  <u>Whether substantial likelihood of success exists on the merits</u>

I find that Plaintiff has alleged facts showing a substantial likelihood of success on the breach of contract claim, but for different reasons than those that Plaintiff argues in its Motion for TRO.  I also find that Plaintiff demonstrates a strong probability of prevailing on its claim of misappropriation.

#### i.   <u>Breach of Contract</u>

"To state a breach of contract claim under Illinois law, [plaintiff] must allege (1) the existence of a valid and enforceable contract; (2) the plaintiff's performance of the contract; (3) the defendant's breach of the contract; and (4) resulting injury."  *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 819-20 (N.D. Ill. 2014).  As noted previously, the parties do not dispute the enforceability of the Confidentiality Agreement nor Plaintiff's performance under that contract by employing Defendant.

As to breach, Plaintiff argues that Defendant violated the Confidentiality Agreement by disclosing Confidential Information to the Competitor, but it also alleges facts that implicate the

agreement's non-solicitation and non-interference provisions.  While I do not find that Plaintiff presents a compelling case for succeeding on the breach of contract claim due to disclosure of Confidential Information, I do find that Plaintiff's facts demonstrate a strong likelihood of prevailing on a claim that Defendant violated the Confidentiality Agreement's Non-Solicit and Non-Interference provisions.

Plaintiff makes two arguments regarding breach of the Confidentiality Agreement: that Defendant disclosed Confidential Information when soliciting employment with the Competitor and that Defendant's sharing of Confidential Information amounts to threatened misappropriation so as to invoke the inevitable disclosure doctrine.  I address Plaintiff's arguments in turn before addressing facts that support Plaintiff prevailing based upon Defendant's breach of restrictive covenants.

First, Plaintiff argues that it will prevail based upon "Defendant clearly violat[ing] his Confidentiality Agreement at a minimum back in October 2020 when he disclosed to [the Competitor] information about [Plaintiff's Metrics] . . . and . . . strategic plan" (DE 21 at 12).  Thus, Plaintiff's argument implicates the Resume that Defendant sent to the Competitor, which included the 30/60/90 Day Plan (DE 23-1 at ¶30(c)) and a Business Development Vision (DE 21-3 at 72).

Defendant disputed at the Hearing that the information contained in the Resume was Confidential.  (DE 32).  Therefore, a factual dispute exists.  The Evidentiary Hearing to take place on June 2, 2021, has been set to allow the parties an opportunity to present evidence relative to their positions on factual matters relating to Plaintiff's claims.  Thus, I find that it would be premature for the Court to make a finding at this time that Defendant disclosed Confidential Information to the Competitor in the subject Resume or communications with the Competitor.

Additionally, relative to the financial Metrics that Plaintiff alleges Defendant shared with the Competitor, it is noteworthy that Defendant was "boasting" about results Plaintiff (impliedly because of Defendant) achieved versus portraying an intent to share confidential information. While even an inadvertent or subtle disclosure of confidential information may constitute a breach under the Confidentiality Agreement, the distinction counters Plaintiff's portrayal of Defendant as seeking to inflict immediate harm upon Plaintiff by sharing Plaintiff's Confidential Information with the Competitor.

Also, with respect to the strategic plan information that Plaintiff alleges Defendant shared with the Competitor, Mr. Buckridge initially attests that Defendant sent to the president of the Competitor a plan for expansion that was essentially a plagiarized copy of a "30/60/90 day plan" that Mr. Buckridge prepared previously.  (DE 1 at 35(c)); DE 23-1 at ¶30(c)).  Mr. Buckridge, however, does not provide a copy of the "30/60/90 day plan" that he originated first, and the 30/60/90 Day Plan that Defendant sent to the competitor is one page and lists very broad objectives, which could apply universally to businesses that are large enough to require such planning.  *See* DE 21-3 at 74 (providing, as an example, for a 90 day "listen and learn" period consisting of "verbal communications with team members" and development of key performance indicators, or "KPIs for sales and business development understanding").  Therefore, I cannot conclude that Plaintiff shared Confidential Information of Plaintiff with the Competitor by virtue of the 30/60/90 Day Plan that Defendant sent to the Competitor.

Mr. Buckridge also attests that the Business Development Vision that Defendant sent to the Competitor included Confidential Information that is part of Plaintiff's strategic plan. (DE 21-2 at ¶11). The Business Development Vision that Defendant shared lists six "initiatives" that, like the 30/60/90 Day Plan, are very broad.  For example, the Business Development Vision lists an

initiative to "attend industry events, conferences and trade shows, to network with decision makers and identify new business opportunities then provide feedback, information on market and creative trends to senior management." (DE 21-3 at 72). On its face, the Business Development Vision lacks specifics that would indicate it communicates a strategy proprietary to Plaintiff, and Plaintiff does not explain how the "vision" that Defendant shared can be considered proprietary. Thus, I cannot determine at this time that Defendant shared Plaintiff's Confidential Information in seeking employment with the Competitor in violation of the Confidentiality Agreement on the basis of the Resume that Defendant sent to the Competitor.

Second, Plaintiff's reliance upon the inevitable disclosure doctrine is misplaced because it does not apply in the instant case. Plaintiff argues that the disclosure of Confidential Information is a breach of contract that warrants the Court prohibiting Defendant from working for the Competitor based upon *PepsiCo., Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). That case stands for the proposition that Illinois law supports an injunction prohibiting employment of an executive by a competitor under "the inevitable disclosure doctrine." (DE 21 at 12). The inevitable disclosure doctrine applies to "threatened misappropriation . . . where there is a high degree of probability of inevitable and immediate use of trade secrets." *PepsiCo.*, 54 F.3d. at 1268 (internal quotation marks and citation omitted). Yet, Plaintiff did not bring a trade secret misappropriation claim under Illinois law. Moreover, Plaintiff concedes that "Florida has not adopted or [has] declined to adopt the inevitable disclosure standard." (DE 21 at n.8) (citing *Proudfoot Consulting Co. v. Gordon*, 573 F.3d 1223, n 12 (11th Cir. 2009)). Thus, the *PepsiCo* case does not support Plaintiff's claims.

Nonetheless, I find that the Non-Solicit and Non-Interference provisions of the Confidentiality Agreement are enforceable under Illinois law and that Plaintiff alleged facts

indicating that Defendant breached those restrictive covenants.[12]  (DE 17-1 at 2).  One fact is that "less than a week before Defendant formally resigned, [Plaintiff] was advised by a customer with whom Defendant had a close, personal relationship that it would be non-renewing its long term supply contract with [Plaintiff] to go with another provider with 'better pricing.'" (DE 21 at 8; DE 21-2 at ¶18).  Another fact is that Defendant contacted a key material supplier on January 6, 2021, had a 30-plus minute call with the supplier, and the supplier's subsequent conduct indicated that it had confidential information concerning Plaintiff's contract with a key customer.  (DE 21 at 9; DE 21-2 at ¶17).  Still another fact is that Defendant printed pricing information for two customers after he drafted his resignation letter on January 4, 2021.  (DE 1 at ¶¶ 19, 35(b), (d); DE 21-3 at ¶15).  The timing of Defendant's printing of this information, coming simultaneous with his resignation and at a point where his obligations to Plaintiff potentially ended, is suspect even though Plaintiff notes that Defendant returned it shredded.  (DE 21 at n.4).  Additionally, while the allegation lacks specificity, Plaintiff contends that it has encountered incidents with suppliers pushing unexpectedly for price increases.  (DE 21 at 9).  Thus, I conclude that Plaintiff demonstrates a substantial likelihood of success with respect to Defendant having violated the Non-Solicit and Non-Interference provisions of the Confidentiality Agreement.

---

[12] The reasonableness (and thus enforceability) of a restrictive covenant is determined in light of the unique factors and circumstances of the case.  *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1107 (N.D. Ill. 2016) (citations omitted); *Cumulus Radio Corp. v. Olson*, 80 F. Supp. 3d 900, 909 (C.D. Ill. 2015).  Here, neither party alleges the existence of an employment contract with or without a noncompete clause.  Therefore, I conclude that Defendant was an at-will employee who continued to work for Plaintiff for nearly two years after signing the subject Confidentiality Agreement in March 2019 before voluntarily resigning.  I also conclude that these circumstances along with the nature of Plaintiff's business and the covenants' limitations, would give rise to a finding that the restrictive covenants in the Confidentiality Agreement are enforceable.  Notably, as well here, is an absence of argument that the restrictive covenants are not enforceable.

### ii.   Trade Secret Misappropriation

Plaintiff brings claims for trade secret misappropriation under federal and state law.  In Count I of the Complaint, Plaintiff brings a trade secret misappropriation claim under the Defend Trade Secrets Act of 2016, which creates a private cause of action in favor of the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  The DTSA defines trade secrets broadly as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).  Misappropriation of a trade secret under the DTSA means, *inter alia*, "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret."  18 U.S.C. § 1839(5)(B)(ii)(II)-(III).

To state a claim under the DTSA, a plaintiff must allege that it "(i) possessed information of independent economic value that (a) was lawfully owned by the plaintiff and (b) for which the

plaintiff took reasonable measures to keep secret, and (ii) the defendant used and/or disclosed that information, despite (iii) a duty to maintain its secrecy." *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1293 (S.D. Fla. 2018) (internal quotation marks and citations omitted).

Florida law, under the FUTSA, similarly provides a cause of action for the misappropriation of trade secrets. *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018) (citing Fla. Stat. §§ 688.001-009). "To prevail on a FUTSA claim, a plaintiff must demonstrate that (1) it possessed a 'trade secret' and (2) the secret was misappropriated." *Id.* (internal quotation marks and citations omitted). A trade secret consists of information that (1) derives economic value from not being readily ascertainable by others and (2) is the subject of reasonable efforts to maintain its secrecy. *See* Fla. Stat. § 688.002(4). "Misappropriation" is defined in essentially the same manner as under the DTSA. *See* Fla. Stat. § 688.002(2)). "Information that is generally known or readily accessible to third parties cannot qualify for trade secret protection." *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998).

I find that Plaintiff adequately alleges that its "[p]ricing, margins, customer contracts and pricing terms, pricing strategies, marketing plans, margins, performance, strategic plans, budgets, customer feedback, supplier assessments, acquisition plans, customer information, supplier information and pipeline information" are trade secrets. (DE 21 at 14). Plaintiff alleges that the information would be valuable in the hands of its competitors and that it took reasonable steps to maintain the confidentiality of such information. (DE 1 at ¶¶3, 8, 10-18; DE 21 at 4). Plaintiff also contends that the information is of the type that is recognized as being a trade secret under federal and Florida law. (DE 1 at ¶18; DE 21 at 4, 13-14) (citing *VAS Aero Servs., LLC v. Arroyo*,

860 F. Supp. 2d 1349, 1359 (S.D. Fla. 2012) (collecting cases)).  Thus, Plaintiff demonstrates that the information it seeks to protect qualifies as a trade secret under federal and Florida law.

I also find that Plaintiff presents compelling evidence that Defendant has the "motive, intention, and inclination" to misappropriate Confidential Information of Plaintiff for reasons that Plaintiff outlines in its Motion for TRO and as detailed above. (DE 21 at 15).  In particular, Plaintiff presents evidence that Defendant: (1) downloaded Confidential Information to an external storage device after accepting a conditional employment offer from the Competitor and only deleted this information after Plaintiff placed him on suspension pending investigation; (2) deleted information from computer devices prior to submitting them for Plaintiff's examination, including at least one phone call in violation of the Stipulated Order; and (3) both printed information about two of Plaintiff's customers and then shred the printed information after resigning.  Plaintiff has also alleged actual misappropriation through evidence detailed above indicating that Defendant contacted and had a 30-plus minute conversation with a key material supplier on January 6, 2021, after resigning and being placed on suspension, following which the supplier demonstrated that it has confidential information pertaining to a contract that Plaintiff has with a customer.  While the definition of "misappropriate" invokes "disclosure or use," the statutory remedies under the DTSA include granting an injunction "to prevent any 'actual' or 'threatened' misappropriation." 18 U.S.C. § 1836(3)(A)(i).  Here, Plaintiff has demonstrated both.  Accordingly, I find that Plaintiff has shown a strong likelihood of prevailing on its claims of trade secret misappropriation under the DTSA and the FUTSA.

**B.  <u>Whether Plaintiff will suffer immediate and irreparable injury if not issued</u>**

An applicant for a preliminary injunction must show that it will likely suffer irreparable harm before the Court can render a decision on the merits. *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 22 (2008).  Furthermore, "'irreparable' injuries must be 'actual and imminent'" and not "prospective and wholly speculative." *TransUnion Risk & Alternative Data Sols., Inc. v. Challa*, 676 F. App'x 822, 827 (11th Cir. 2017).  Under Florida law, there is "'a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant.'" *Id.* at 825 (quoting Fla. Stat. Ann. § 542.335(1)(j)).

"A related consideration, relevant to the alleged irreparability of the harm, is timeliness.  The Second Circuit has observed, and others [have] agreed, that '[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic speedy action.'" *Great Am. Ins. Co. v. Fountain Eng'g, Inc.*, No. 15-CIV-10068-JLK, 2015 WL 6395283, at *4 (S.D. Fla. Oct. 22, 2015) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) and collecting other cases).  In other words, a plaintiff seeking a significant extension of time for the Court to rule on preliminary injunctive relief "cuts against the factor of irreparable harm . . . [for] the extraordinary and drastic remedy." *Marketran, LLC v. Brooklyn Water Enterprises, Inc.*, No. 9:16-CV-81019-WPD, 2016 WL 8679294, at *1 (S.D. Fla. Aug. 8, 2016) (citation omitted).

Here, I find that Plaintiff is not likely to suffer immediate and irreparable injury if the injunction is not issued to enjoin Defendant from working at the Competitor for the following reasons.  First, in soliciting employment with the Competitor, Defendant made the Competitor aware of his agreement to maintain Plaintiff's Confidential Information and the Non-Solicit and Non-Interference restrictive covenants in his Confidentiality Agreement and indicated that he had consulted counsel regarding those provisions.  (DE 21-3 at 78).  This militates against finding that the "created" position Defendant accepted with the Competitor puts Plaintiff at risk of harm due

to Defendant's use of Plaintiff's Confidential Information.  To the contrary, it weighs in favor of the inference that the Defendant intended to comply with his Confidentiality Agreement and that the Competitor offered Defendant a position that considered Defendant's limitations and structured a position for Defendant to contribute to the Competitor without violating the Confidentiality Agreement or engaging in misappropriation of trade secrets.

Second, Plaintiff agreed to extend the time for the Court to rule on preliminary injunctive relief by 45 days upon the Court's issuance of the Stipulated Order, which time extension also weighs in favor of finding injury to Plaintiff from Defendant's employment with the Competitor to not be "imminent."  In the 45 days that Plaintiff had for further investigation and discovery, it surfaced nothing more substantively than what Plaintiff knew at the time it filed the Complaint. The lack of Plaintiff surfacing substantial "new" evidence during the 45-day extension period further supports not finding that Defendant's employment with the Competitor creates "imminent" harm.

Thus, while there is a presumption of irreparable harm due to finding that Plaintiff is likely to prevail on its claim that Defendant violated a restrictive covenant, that finding is mitigated as to enjoining Defendant's present employment by the fact that the Competitor had prior notice of Defendant's contractual obligations and by Plaintiff's delay in seeking that specific relief.  Further, as Plaintiff presents no evidence that Defendant has continued to violate agreed-to restrictive covenants post-issuance of the Stipulated Order, the presumption of irreparable harm is adequately addressed by a continuance of the Stipulated Order.

**C.   Whether Plaintiff's threatened injury outweighs potential damage to Defendant**

Here, I find that the balance of potential harm to Defendant in enjoining his employment outweighs the potential harm to Plaintiff.  Plaintiff has not alleged that it has lost business to the Competitor in any form, i.e., favorable supply agreements or customers.  Furthermore, even assuming that Defendant has disclosed Plaintiff's trade secrets to the Competitor (and I do not find that he has) Plaintiff theoretically has the ability to seek relief against the Competitor if the Competitor uses Plaintiff's trade secrets to compete against it.  *See* 18 U.S.C. § 1839(3) ("Under the DTSA, 'misappropriation' [includes] – (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.").  On the other hand, precluding Defendant from working for Plaintiff's direct competitors, or even disrupting his current employment during the instant litigation, has potentially far more serious consequences to the Defendant's career and ongoing ability to earn a living in an industry to which he has dedicated his professional efforts for more than a quarter-century. Continuing the Stipulated Order, however, maintains the status quo without adverse consequence because Defendant has agreed to it, and Plaintiff has not shown that Defendant has violated the confidentiality provisions or the restrictive covenants since the Stipulated Order was issued.

**D.   Whether the injunction would not be adverse to the public interest**

As Plaintiff correctly argues, the public has a significant interest in safeguarding businesses from misappropriation of trade secrets by employees.  *VAS Aero Servs., LLC*, 860 F. Supp. 2d at 1363 ("[P]reliminary injunction would affirmatively serve the public interest by protecting businesses from employees who misappropriate their trade secrets.").  Indeed, under Florida law, "an injunction prohibiting a former employee from using trade secrets to solicit existing customers clearly does not disserve the public interest of protecting legitimate business interests." *East v.*

*Aqua Gaming, Inc.*, 805 So. 2d 932, 934 (Fla. 2d DCA 2001).  Accordingly, while I do not find that enjoining Defendant's employment as Plaintiff requests is warranted, continuation of the Stipulated Order is appropriate and supported by Florida law under circumstances present here.

### E.  <u>Scope of Relief</u>

I recommend that the Court deny the Motion for TRO to the extent that Plaintiff seeks to enjoin Defendant's employment but grant the Motion for TRO to the extent that Plaintiff seeks to continue the Stipulated Order.  The reasons for denying the request to enjoin Defendant's employment are several.  First, "Florida courts have consistently held that absent a non-compete agreement, a former employee cannot be prohibited from conducting business with the former employer's customers, so long as the employee does not use the former employer's confidential information to do so."  *AutoNation, Inc. v. Mulleavey*, No. 19-60833-CIV, 2019 WL 4693575, at *5 (S.D. Fla. Aug. 22, 2019) (citing as an example *Sethscot Collection, Inc. v. Drbul*, 669 So. 2d 1076, 1078 (Fla. 3d DCA 1996)).  In the instant case, it is undisputed that there is no non-compete agreement.  Furthermore, Plaintiff has not alleged that Defendant is doing business with specific customers of Plaintiff or directing the Competitor to solicit specific customers of Plaintiff.  In fact, Plaintiff has not demonstrated that Defendant is using Confidential Information to compete with Plaintiff in any respect.  Therefore, Plaintiff's conjecture about the harm that Defendant's employment with the Competitor will bring to it is speculative.  Furthermore, as explained above, the authority that Plaintiff cites under Illinois law relative to the inevitable disclosure doctrine is not applicable here because Plaintiff did not plead a misappropriation action under Illinois law.  In addition, injunctive relief remedies available under the DTSA specifically exclude "prevent[ing] a person from entering into an employment relationship."  18 U.S.C. § 1836(b)(3)(A)(i)(I).  Thus,

injunctive relief that prohibits Defendant from working for the Competitor or direct competitors of Plaintiff is not available under federal law and does not appear justified under Florida law.

Second, Plaintiff's conduct in agreeing to an extension of preliminary injunctive relief along with the notice Defendant gave to the Competitor regarding the limitations imposed upon him by the Confidentiality Agreement weigh against granting the relief on an urgent basis without the opportunity for the parties to further engage in discovery and an evidentiary hearing. Even presuming irreparable harm due to Defendant having breached restrictive covenants in the Confidentiality Agreement, Plaintiff has not shown why continuation of the Stipulated Order is insufficient pending the Evidentiary Hearing to be held on June 2, 2021. While Plaintiff demonstrates that Defendant deleted from his personal mobile phone a call from a forensics investigator in violation of the Stipulated Order, which I do not minimize in terms of its implications concerning Defendant's conduct overall, Plaintiff has not demonstrated that Defendant has violated the Stipulated Order by disclosing or using Confidential Information or trade secrets of Plaintiff.

Third, as in *AutoNation*, Plaintiff here "has advanced no argument concerning the time sensitivity of its trade secrets." *AutoNation, Inc. v. Mulleavey*, No. 19-60833-CIV, 2019 WL 4693575, at *6 (S.D. Fla. Aug. 22, 2019). In fact, the Metrics that Plaintiff complains about Defendant having shared with the Competitor in his Resume, even if assumed to represent Confidential Information, already occurred. Additionally, Plaintiff does not explain how temporarily barring Defendant from employment protects trade secret information because it is "time sensitive." Furthermore, I find no reason to otherwise conclude that Plaintiff's trade secrets are particularly time-sensitive.

Fourth, a balancing of the hardships indicates that injunctive relief barring Defendant from employment as Plaintiff requests is a heavy burden for Defendant compared to the burden on Plaintiff.  Defendant risks serious adverse consequences to his ability to earn a living whereas Plaintiff has the potential for recourse to Defendant's employer for misappropriation especially given the employer's awareness of the Confidentiality Agreement.  Therefore, for all the reasons stated, I conclude that an injunction prohibiting Defendant from working for his current employer or direct competitors of Plaintiff is not justified based on the current record.

Continuation of the Stipulated Order is warranted, however, for multiple reasons.  First, Defendant placed himself in the situation of having a potential conflict of interest at the end of his employment tenure with Plaintiff.  Defendant continued to engage in activities with Plaintiff that exposed him to significant Confidential Information of Plaintiff after committing to work for the Competitor, who is in the same general, if not specific, industry as Plaintiff.  Second, Defendant downloaded significant business records of Plaintiff to an external storage drive after accepting the Competitor's conditional offer of employment and deleted those records post-notification that he was under investigation with Plaintiff.  Third, Plaintiff alleges specific instances of supplier and customer conduct indicative of Defendant's interference with those relationships of Plaintiff in violation of the Confidentiality Agreement.  Fourth, Defendant deleted all but one call from his mobile phone prior to turning it over for forensic imaging, including one phone call that he received from Plaintiff's forensic investigator, after receiving notice from Plaintiff's counsel to preserve evidence and subsequent to the Stipulated Order.  Fifth, Plaintiff's review of the forensic evidence is incomplete and ongoing, and the parties have agreed to engage in limited discovery for purposes of the Evidentiary Hearing on June 2, 2021 to more fully resolve Plaintiff's motion for a preliminary injunction.  Finally, Defendant has consented to a continuation of the Stipulated

Order.   I find that extension of the Stipulated Order is thus justified until the Court has an opportunity to hear further evidence and rule on Plaintiff's Motion for Preliminary Injunction (DE 21).

The amount of any injunction bond "lies with the sound discretion of th[e] Court." *VAS Aero Servs., LLC,* 860 F. Supp. 2d at 1364.   Here, I find that no bond is required for a continuation of the Stipulated Order because it simply continues in force requirements to which Defendant has already been subject.

## CONCLUSION

It is hereby

**ORDERED AND ADJUDGED** that the Clerk of the Court correct the docketing of Plaintiff's Renewed and Expedited Motion for Temporary Restraining Order and Preliminary Injunction (DE 21) to add on CM/ECF the preliminary injunction relief that Plaintiff requests.  *See supra* n.1.

Furthermore, for the reasons discussed above, I respectfully **RECOMMEND** that:

1.   The Motion for TRO (DE 21) be **GRANTED** to the extent that the motion seeks to continue the Stipulated Order;

2.   The Stipulated Order be extended *nunc pro tunc* until thirty (30) days following the Evidentiary Hearing to take place on June 2, 2021;

3.   Plaintiff not be required to post bond;

4.   The Motion for TRO be otherwise **DENIED**.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge.  Failure to timely file objections shall bar the

parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

  **DONE AND SUBMITTED** in Fort Lauderdale, Florida on this 13th day of April 2021.

**Jared M. Strauss**
**United States Magistrate Judge**

Copies furnished via CM/ECF to:

Hon. Rodolfo A. Ruiz, II
Counsel of record