## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-CIV-60114 -RUIZ/STRAUSS

**FUTURE METALS LLC**,

    Plaintiff,

v.

**FRANK RUGGIERO**,

    Defendant.

_____/

### REPORT AND RECOMMENDATION

**THIS CAUSE** comes before me upon Plaintiff's Renewed and Expedited Motion for Temporary Restraining Order [("Motion for TRO")] and Preliminary Injunction ("Motion for Preliminary Injunction"). (DE 21).[1] The District Court has referred the case to me for rulings on all pre-trial, non-dispositive matters and for issuance of a Report and Recommendation on any dispositive matters. (DE 24). I have reviewed the Motion for Preliminary Injunction, the response ("Response") (DE 40), the reply ("Reply") (DE 41) and the record in this case. In addition, I held an evidentiary hearing ("Evidentiary Hearing") on the Motion for Preliminary Injunction. (DE 75).[2] At the Evidentiary Hearing, I took testimony, heard oral argument, and reviewed

---

[1] The motion is titled as a motion for both a TRO and a preliminary injunction; however, only the Motion for TRO was initially docketed in CM/ECF. The Clerk corrected CM/ECF to reflect both the Motion for TRO and the Motion for Preliminary Injunction. (DE 21). On April 13, 2021, I issued a Report and Recommendation ("TRO Report") (DE 38) recommending that the Motion for TRO be granted in part and denied in part, which the District Court adopted on April 28, 2021 (DE 43). Therefore, only the Motion for Preliminary Injunction remains pending.

[2] On July 2, 2021, I issued an Order Granting Joint Motion to Redact Transcript of June 2, 2021 Evidentiary Hearing ("Order to Redact"). (DE 91). The Order to Redact directed specific redactions of the Evidentiary Hearing transcript filed on June 9, 2021 ("Redacted Transcript") (DE 75). The Order to Redact also granted leave for the parties to file under seal an unredacted

evidence pertaining to this matter.  Furthermore, I reviewed the parties' pre-hearing briefs (DE 56; DE 60) and post-hearing briefs (DE 88; DE 89) with respect to the Evidentiary Hearing.  Being otherwise duly advised, I respectfully **RECOMMEND** that the Motion for Preliminary Injunction (DE 21) be **GRANTED IN PART AND DENIED IN PART** for the reasons stated herein.

## BACKGROUND

### I.   Procedural History

The parties' dispute arises from Defendant's employment with Plaintiff and subsequent voluntary resignation from that employment to work for its allegedly most significant direct competitor ("TW Metals").  (DE 101 at ¶¶34-35, 44).  On January 15, 2021, Plaintiff filed a six-count Verified Complaint ("Complaint").  (DE 1).  On July 23, 2021, Plaintiff filed its seven-count First Amended Complaint ("Amended Complaint")[3] alleging the following causes of action:

> Count I – Misappropriation of Trade Secrets Pursuant to the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*;
>
> Count II – Violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C);
>
> Count III – Misappropriation of Trade Secrets in Violation of Pennsylvania's Uniform Trade Secrets Act ("PUTSA"), 12 Pa. C.S.A., § 5301, *et seq.*;
>
> Count IV – Misappropriation of Trade Secrets in Violation of Florida's Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.002;
>
> Count V – Breach of the Confidentiality Agreement;
>
> Count VI – Breach of Fiduciary Duty/Duty of Loyalty; and

---

copy of the Transcript, which Defendant filed on July 8, 2021.  (DE 93).  I cite to the Redacted Transcript only.

[3] On May 21, 2021, Plaintiff filed a motion to amend the Complaint to add a count for violation of the Illinois Trade Secrets Act ("ITSA").  (DE 51).  On July 23, 2021, I entered an Order granting Plaintiff's motion to amend the Complaint.  (DE 98).

Count VII – Misappropriation of Trade Secrets in Violation of Illinois' Uniform Trade Secrets Act ("I[]TSA"), (765 ILCS § 1065, *et seq.*).

(DE 101).

Plaintiff filed Plaintiff's Expedited Motion for Temporary Restraining Order and Preliminary Injunction ("First Motion") on January 19, 2021. (DE 5). The District Court ordered Defendant to file a response on or before January 26, 2021 and ordered Plaintiff to file a reply, if any, by January 29, 2021. (DE 9).

The District Court then held a status conference on January 22, 2021 regarding the First Motion and ordered Plaintiff to file a report by January 25, 2021 regarding the parties' efforts to reach an agreement as to the relief sought. (DE 15). Plaintiff's status report (DE 16) filed on January 25, 2021 reported that the parties worked collaboratively to reach an agreement and stated that the parties would submit a Stipulated Consent Injunction and Order ("Proposed Stipulated Order"). On January 26, 2021, the parties filed the Proposed Stipulated Order. (DE 17). The District Court then entered the same day the Stipulated Order, which administratively closed the case. (DE 18). The Stipulated Order was to remain in effect for forty-five (45) days, following which the parties were directed to file a status report regarding the parties' efforts to resolve the dispute. (DE 18 at 5).

On March 15, 2021, Plaintiff filed a status report ("March 15 Status Report") (DE 19) and a motion to reopen the case ("Motion to Reopen") (DE 20). Plaintiff's March 15 Status Report (DE 19) and its Motion to Reopen (DE 20 at ¶6) both stated similar allegations – that Defendant had misappropriated and continued to misappropriate Plaintiff's Confidential Information. On March 16, 2021, the District Court issued an Order Reopening Case and ordered that Defendant shall file his answer to the Complaint within thirty-five (35) days. (DE 22).

On April 13, 2021, I issued a Report and Recommendation, adopted by the District Court on April 28, 2021, recommending that Plaintiff's Motion for TRO be granted in part and denied in part to extend the Stipulated Order for thirty (30) days following the Evidentiary Hearing and to otherwise deny the Motion for TRO.[4]  (DE 38 at 43; DE 43).  On April 20, 2021, Defendant filed his Answer and Affirmative Defenses to Verified Complaint.  (DE 39).  Pursuant to the Court's Order granting leave (DE 98), Plaintiff filed its First Amended Complaint on July 23, 2021.  (DE 101).

On August 6, 2021, the parties requested time to conduct settlement discussion, which was granted by an Order that also administratively closed the case.  (DE 106; DE 107).  On August 26, 2021, the parties filed a joint status report informing the Court that settlement discussions remained ongoing.  (DE 114).  Later that same day, the parties filed a joint motion to reopen the case due to an impasse.  (DE 115).  On September 1, 2021, the Court granted the motion to reopen.  (DE 116).

Plaintiff filed the instant Motion for Preliminary Injunction on March 16, 2021.  (DE 21). On June 2, 2021, I held the Evidentiary Hearing pertaining to the motion.  (DE 75 at 7:3).  Plaintiff seeks, in relevant part, "an injunction prohibiting [Defendant,] a former executive employee who . . . signed a confidentiality agreement and had access to trade secrets from working for a competitor."  (DE 21 at 12).

---

[4] The thirty-day timeframe was to allow time for a report and ruling on the Motion for Preliminary Injunction.

## II. **Background and Findings of Fact**

### A. **Background**

#### i. **The Amended Complaint**

In the Amended Complaint, Plaintiff alleged that it is in the business of, among other things, selling and supplying aerospace quality metals and materials to the global aircraft manufacturing and maintenance industry for the manufacture of component parts. (DE 101 at ¶6). Plaintiff also alleged that it and its affiliates operate from strategically located service centers throughout various parts of the world in order to acquire favorable pricing and delivery terms for high quality products. *Id.* at ¶7. Plaintiff averred that it is in a highly specialized and competitive industry with a limited number of competitors such that any "edge" is significant relative to acquiring and retaining business. *Id.* at ¶8. Therefore, Plaintiff's confidential information, as defined in the Amended Complaint, provides Plaintiff with a significant edge in competing for business. *Id.* Specifically, the Amended Complaint defined confidential information ("Confidential Information") as including, but not being limited to, the following:

1. confidential information as to pricing, margins, customer proposals, customer contracts, customer pricing, product differentiation, pricing strategies, competitive intelligence, and positioning and bidding strategies;

2. product costs, vendor and customer lists (including key contacts, purchasing preferences, pricing, volume, profitability, performance, and needs), lists of approved components and sources, business and marketing plans, sales figures and other financial information not yet announced or publicly disclosed;

3. marketing plans, strategic plans, business plans, acquisition plans and strategies, costs of products and services, growth and development targets, profitability of various products and services, and internal financial information (including but not limited to from which products/services Future Metals derives its revenue from a customer, what products/services are being provided to a customer, and which products/services are the most profitable);

4. service and product capabilities, functionality, features, and designs, and sourcing strategies to maintain competitive costs;

5.  budgets;

6.  bids, proposals, presentations, sales pipeline information (including proposals) and information concerning customers and potential customers and their needs and requirements (including but not limited to identity, revenue, volume, profitability as to each product/service and overall, requirements, needs, preferences, concerns, plans, experiences, their feedback on Future Metals, and key contacts and decision-makers), and customer lists and prospects;

7.  confidential contract terms and pricing terms with customers;

8.  new business plans and strategies; [and]

9.  financial and accounting data, operating costs, costs of goods sold, and credit limits.

(DE 101 at ¶12).

Additionally, Plaintiff alleged that Defendant is a former executive that Plaintiff employed for more than thirteen (13) years who worked in a key sales position.  *Id.* at ¶¶19-20.  Defendant voluntarily resigned his position with Plaintiff on January 4, 2021, effective January 15, 2021, after Plaintiff made an announcement in September 2020 that it had elected Mr. John Buckridge to the position of president instead of Defendant.  (DE 101 at ¶¶19, 34; DE 23-1 at ¶5).  Plaintiff learned, after Defendant's resignation, that he had accepted a position with TW Metals in late November 2020 but had continued working for Plaintiff and had continued acquiring Confidential Information about Plaintiff by participating, among other things, in the development of new pricing and corporate budgets.  (DE 101 at ¶35; DE 23-1 at ¶29).  Defendant also attended a five-day annual strategy and planning meeting in December 2020, which Plaintiff maintains that Defendant should not have attended after accepting a position with TW Metals.  (DE 101 at ¶35(a)).

Plaintiff further alleged that, after accepting employment with TW Metals, on or about November 30, 2020, Defendant saved numerous proprietary documents to his desktop.  *Id.* at ¶35(b).  Additionally, Defendant downloaded documents containing Confidential Information to

an external storage device and sent a business expansion plan to the president of TW Metals that was essentially a plagiarized copy of a plan prepared by Plaintiff's president.  (DE 101 at ¶¶35(c)-(d)).

The Amended Complaint requested that Defendant be enjoined from using or disclosing Plaintiff's trade secrets and other Confidential Information and from violating the terms of the Confidentiality Agreement.   In addition, among other relief sought, Plaintiff requested that "Defendant be temporarily, preliminarily, and permanently enjoined and restrained, for a period of time deemed proper by the Court to protect [Plaintiff's] trade secrets, *from directly or indirectly working for* or providing services or information to TW Metals, any competing business in which he may have an ownership interest, or any other direct competitor of [Plaintiff]."  *Id.* at 22, ¶B (emphasis added).  (collectively, "Basic Facts and Requested Relief").

### ii.   <u>The Stipulated Order</u>

The Stipulated Order issued by the District Court, on January 26, 2021, stated that Plaintiff is a limited liability company having its principal place of business in Broward County, Florida. (DE 18 at ¶1).  The order also stated that Defendant held the position of Executive Vice President of Plaintiff and "had executive level knowledge of and access to Confidential Information of [Plaintiff]."  *Id.* at ¶2.

Confidential information is defined in the Stipulated Order in the same manner as in the Amended Complaint except that the Stipulated Order added: "*customer feedback survey information; and supplier pricing, performance and capability assessments*" ("Stipulated Confidential Information").  *Id.* at ¶6 (emphasis added).  The order acknowledged that the parties disputed whether there was a substantial threat and risk of misappropriation of trade secrets and whether Defendant had violated his Confidentiality Agreement with Future Metals based on

allegations in the Complaint. *Id.* at ¶3. Indeed, Defendant maintained that he had not used or disclosed any of Plaintiff's trade secrets or violated any agreement with Plaintiff. *Id.*

Further, the order stated that the parties stipulated and agreed to the entry of the order on an interim basis to avoid litigation while reserving all rights, claims, and defenses and that the parties would not be prejudiced as a result of the order in the event the matter was further litigated. *Id.* at ¶4. In issuing the Stipulated Order, the District Court directed that Defendant would be enjoined, restrained, and prohibited from directly or indirectly engaging in any of the following conduct:

> a) Using or disclosing to any person any trade secrets and other Confidential Information [as defined in the order], and *from violating the terms of his Confidentiality Agreement*, which [was] attached . . . as Exhibit 1; [and]
>
> b) *Interfering with or adversely affecting [Plaintiff's] relationships with* (including calling on or soliciting) *any customer or entity with whom Defendant did business or had personal contact in performing duties for [Plaintiff]*. The restriction in this paragraph . . . is limited to the two-year period immediately following the date Defendant's employment with [Plaintiff] ended.

(DE 18 at ¶5(a) and (b)) (emphasis added). The order also set forth directives requiring Defendant to: "[(1)] immediately preserve and return to [Plaintiff] any Confidential Information of Plaintiff . . . [; (2)] grant [Plaintiff's computer forensics provider] supervised access to [and right to image] all personal computer, external storage devises and/or personal accounts which [Plaintiff's] computer records indicate may have been used to transfer or download [Plaintiff's] documents/electronic information, including but not limited [to] a Seagate storage device, Defendant's iCloud account, Defendant's Google Docs account, and any home or other personal computer or external hard drive/storage device he used on or after October 1, 2020[; and (3)] . . . *preserve* and immediately return to [Plaintiff's counsel] all Confidential Information and property

of [Plaintiff] in [Defendant's] possession and control," including *all electronic information pertaining to Plaintiff*. *Id.* at ¶¶7-9.

### iii.   The Motion for Preliminary Injunction

Although the Motion for Preliminary Injunction (DE 21) is confusing as to the exact relief being sought,[5] the parties do not dispute that Plaintiff seeks injunctive relief to prohibit Defendant from working for Plaintiff's competitors, including TW Metals.[6]  Indeed, Plaintiff's Reply makes clear that it seeks injunctive relief under the inevitable disclosure doctrine, as applied in *PepsiCo, Inc. v. Redmond*, to enjoin Defendant from working for TW Metals or other competitors of Plaintiff.  (DE 41 at 4-6) (citing 54 F.3d 1262, 1271 (7th Cir. 1995)).  Defendant's Response likewise acknowledges that Plaintiff "seeks to enjoin Defendant . . . from remaining employed by [TW Metals]" and argues that Defendant should not be "prevent[ed] . . . [from] earn[ing] a living in his field of employment."  (DE 40 at 1).  As grounds for the requested relief, Plaintiff alleges

---

[5] As previously noted, the instant motion is titled as a motion for both a TRO and a preliminary injunction; however, the motion requests only a TRO and a hearing on a preliminary injunction in the prayer for relief.  (DE 21 at 21-22).  The proposed TRO attached to the instant motion references its motion for preliminary injunction and seeks, among other things, to specifically "enjoin[ ], restrain[ ] and prohibits[ ] [Defendant] . . . from directly or indirectly working for or providing employment, advice, services or information to TW Metals, or any other direct competitor of Future Metals."  (DE 21-4 at 3-6).  While there is no specific prayer for relief for a preliminary injunction, it is reasonable to presume that the motion seeks one with the same restrictions upon Defendant as those requested relative to the TRO.

[6] Plaintiff, however, modified somewhat the relief sought when filing its post-hearing brief ("Plaintiff's Post-Hearing Brief").  (DE 89).  While not relinquishing its pursuit of the full injunctive relief sought in the Motion for Preliminary Injunction, Plaintiff "requests this Court enter a preliminary injunction . . . [that] at a minimum: (1) continu[es] the existing injunction (Dkt. No.s 17-18), including the restrictions on interfering with or adversely affecting Future's relationship with (and calling on or soliciting) customers and suppliers with whom he did business or had personal contact in performing duties for [Plaintiff], and (2) [prevents Defendant from] working on or in, or advising about, the lines of business in which Plaintiff and TW [Metals] compete (e.g., MRO business, aerospace grade tubing, aerospace sheet extrusion and aerospace bar and plate metals for aerospace components.)."  *Id.* at 2.

that Defendant is working in a position with TW Metals that will cause him to use Plaintiff's trade secret information and violate his Confidentiality Agreement.  (DE 21 at 3).

The Motion for Preliminary Injunction primarily repeats the Amended Complaint's Basic Facts and Requested Relief but elaborates on them as a result of its forensics investigation.  The examination of Defendant's computer devices and accounts by Plaintiff's forensics investigator during the forty-five (45) day extension period provided by the Stipulated Order did not produce evidence of Defendant retaining or sharing Plaintiff's Confidential Information since issuance of the Stipulated Order.  The examination did, however, surface evidence that Defendant deleted at least one phone call from his iPhone in violation of the Stipulated Order as more fully discussed below.  (DE 21-3 at ¶18).

Plaintiff posits that "Defendant has the motive, the opportunity and a proven inclination to interfere with [Plaintiff's] relationships with customers and suppliers and provide TW Metals with highly confidential, proprietary trade secrets that could damage [Plaintiff's] competitive advantage" and impact the job security of its 100-plus employee base.[7]  (DE 21 at 3).  Plaintiff also alleges that Defendant engaged in deceitful conduct creating a lack of trust in Defendant's adherence to the terms of his Confidentiality Agreement with Plaintiff.  (DE 21 at 8-9).

### 1.  Motive

In support of alleging that Defendant has a motive to breach the Confidentiality Agreement and misappropriate Plaintiff's trade secrets, Plaintiff alleges that Defendant was upset that he was

---

[7] The Motion for Preliminary Injunction attaches three (3) declarations: the January 18, 2021 Declaration of John Buckridge as Exhibit 1, the Supplemental Declaration of John Buckridge dated March 15, 2021 as Exhibit 2 and the Declaration of Daniel Roffman as Exhibit 3, Plaintiff's forensics investigator ("FI Declaration").  (DE 21 at n.1; DE 21-1; DE 21-2; DE 21-3).  On March 16, 2021, Plaintiff filed a notice of corrected exhibit attaching a revised Exhibit 1 to the instant motion.  (DE 23-1).

passed over for the position of President with Plaintiff.  (DE 21 at 6; DE 23-1 at ¶5).  Plaintiff's

current President, Mr. Buckridge, reported to Defendant for a period of time before being promoted

to the position of president with Plaintiff in September 2020.  (DE 23-1 at ¶5).

## 2.  **Opportunity**

Plaintiff contends that the highly competitive nature of its business and Defendant's

familiarity with key aspects of its business provides Defendant with the opportunity to interfere

with its customer and supplier relationships.  (DE 21 at 3-5; DE 23-1 at ¶¶8, 19-25).  In particular,

Plaintiff alleges that to meet the needs of its customers it maintains an inventory of quality metals,

and it strategically positions warehouses to supply its customers with quality metals on short notice

at competitive prices.  (DE 21 at 3-4; DE 23-1 at ¶¶8-12).  As such, Plaintiff alleges that

Defendant's executive-level awareness of the Confidential Information of Plaintiff and

Defendant's direct contact with key customer accounts and involvement with mill supply

negotiations and pricing of raw materials, including pricing that is tied to Plaintiff's contracts with

customers, would benefit Defendant in his new position with TW Metals to the detriment of

Plaintiff.  (DE 21 at 5-6; DE 23-1 at ¶¶6-18; DE 101 at ¶¶25-26).

Plaintiff contends that the opportunity to share Plaintiff's Confidential Information is, in

fact, exacerbated by the position that Defendant holds with TW Metals.  (DE 21 at 9). Plaintiff

alleges that, *after Defendant made TW Metals aware of the Confidentiality Agreement*,[8] *TW Metals*

*created a position for Defendant* involving developing and implementing a business development

---

[8] On November 3, 2020, Defendant sent a copy of the Confidentiality Agreement to TW Metals
and noted that he "ha[d] received guidance from outside council [sic] today on [clauses pertaining
to confidential information and non-solicitation/non-interference] and [wanted] to make sure [TW
Metals was] fully aware." (DE 21-3 at 77).  As discussed *infra*, I find that this cuts against
Plaintiff's argument that Defendant is sharing Confidential Information with TW Metals.

strategy to profitably grow the TW Metals' aerospace market share globally, which is the *same market* that Defendant dedicated his efforts to while working for Plaintiff. (DE 21 at 7).

### 3. **Inclination**

Plaintiff alleges several instances of conduct by Defendant that it argues demonstrate the Defendant's inclination to share Confidential Information with TW Metals. First, Plaintiff alleges that Defendant shared Confidential Information when he solicited TW Metals for employment and indicated a proclivity to further share Confidential Information by promoting his ability to provide "market intelligence" to TW Metals. Second, Plaintiff alleges that Defendant inappropriately remained working for Plaintiff and garnered even more significant Confidential Information after he accepted a conditional offer of employment with TW Metals.[9] Third, Plaintiff alleges that Defendant took steps to download and retain Plaintiff's Confidential Information for personal use and interfered with Plaintiff's business relationships while still working for Plaintiff. (DE 21 at 6-9).

In support of Plaintiff's first contention that Defendant was inclined to, and did share, Confidential Information when pursuing employment with TW Metals in mid-October 2020, Plaintiff attaches the January 18 Declaration of President John Buckridge (DE 23-1), the March 15 Declaration of President John Buckridge (DE 21-2) and the FI Declaration of its forensics investigator dated March 15, 2021 (DE 21-3). Plaintiff alleges that Defendant shared Confidential

---

[9] TW Metals' offer of employment, which Defendant received on November 23, 2020, was subject to a background check, psychological evaluation and a drug test. (DE 21-2 at ¶15; DE 21-3 at ¶13). On December 4, 2020, Defendant sent an email to TW Metals confirming that he had signed the release for the background check and completed all other prerequisites. (DE 21-3 at 85-86). On December 28, 2020, Defendant sent an email to TW Metals "confirm[ing] once again that [his] intention [was] to give notice to [Plaintiff] on Monday, January 4th." (DE 21-3 at 85). In the email, Defendant stated that he anticipated his start date would be January 18th or 19th unless Plaintiff released him immediately, in which case Defendant requested to start with TW Metals on Monday, January 11, 2021. *Id.*

Information with TW Metals by including in his resume ("Resume") (DE 21-3 at pp. 53-75) an essentially plagiarized strategic vision for TW Metals and sharing certain confidential financial metrics of Plaintiff.  (DE 21 at 6; DE 21-2 at ¶¶9-11; DE 21-3 at ¶¶12-20, pp. 53-75).  Plaintiff also cites as evidence Defendant's October 16, 2020 email to TW Metals where Defendant states "I am . . . confident that with my experience and *the market intelligence I can provide* . . . we could maximize this historic opportunity to reposition for even greater success in the future."  (DE 21 at 6; DE 21-3 at 65) (emphasis added).  With respect to sharing Confidential Information, Mr. Buckridge attests that Defendant shared Plaintiff's earnings before interest and taxes ("EBIT") and information regarding material margins (a measure of profit over and above the cost of raw materials) ("Material Margins") (collectively, the "Metrics").  (DE 21-2 at ¶¶9-11; DE 21-3 at pp. 53-75).  Plaintiff additionally alleges that the source for the Material Margins was a document that Defendant subsequently downloaded to an external storage drive.  (DE 21 at 6) (citing DE 21-2 at ¶¶15-16, which references a file entitled "SLS.xlsx" that is alleged to contain gross margin information for each type of sale made over the last ten years or more).

Regarding Plaintiff's second contention that Defendant should not have remained in Plaintiff's employ after committing to work for TW Metals, President Buckridge attests that Plaintiff would have terminated Defendant upon learning of Defendant's acceptance of employment with TW Metals rather than allow Defendant to attend strategic planning meetings and continue accessing Plaintiff's Confidential Information.  (DE 23-1 at ¶29).  The Motion for Preliminary Injunction footnotes that evidence shows that Defendant expressed concern to TW Metals that he would be released immediately *in advance of his planned start date in mid-January* once he resigned from Plaintiff, which Plaintiff asserts is indication that Defendant knew he should not continue working for Plaintiff.  (DE 21 at n.3).  President Buckridge also attests that Defendant

did not tell Plaintiff that he would be working for TW Metals when he resigned from his position with Plaintiff on January 4, 2021. (DE 23-1 at ¶¶19, 29).  Rather, through technology that recorded screen shots of Defendant's computer, Plaintiff learned that Defendant had accepted a position with TW Metals.  (DE 23-1 at ¶¶30(a)).  On January 6, 2021, Plaintiff placed Defendant on suspension pending investigation.  (DE 21-2 at ¶16).

As to Plaintiff's third contention, it proffers various evidence pertaining to Defendant downloading Confidential Information and interfering with Plaintiff's relationships. First, Plaintiff alleges that Defendant engaged in storing Plaintiff's Confidential Information to an external storage device after accepting TW Metals' conditional employment offer on November 30, 2020. (DE 21 at 7-8; DE 23-1 at ¶30(e), p. 33).  In support, Plaintiff attaches the FI Declaration, which states that Defendant "appear[ed] to have copied more than 2,900 files to [an expansion drive] on December 3, 2020." (DE 21-3 at ¶14).  The forensic investigator attests that, although many files copied appeared personal in nature, Defendant opened two business files after copying them, namely the "2020 Global Sales Meeting Purchasing (MRO edit for slide 7-8 refresh for the Manager Summit).pptx" ("2020 Global Sales Meeting File") and "SLS.xlsx." ("Sales History File").  (DE 21-3 at ¶14; DE 23-1 at ¶30(e), p. 33).  President Buckridge attests that the Sales History File is a "comprehensive list of all sales for a period covering more than the last ten years by customer and product, and included the gross margin on each type of sale, budgets and goals, product trend data, and sales reports by territory and division." (DE 21-2 at ¶16).  Thus, Plaintiff alleges that Defendant took these steps to acquire for his personal use the Confidential Information of Plaintiff.

Second, as to Defendant's inclination to interfere with Plaintiff's relationships in violation of the Confidentiality Agreement, Plaintiff alleges that Defendant contacted a key material supplier

on January 6, 2021 and had a 30-plus minute call with the supplier, after which the supplier behaved in a manner to indicate that it had Confidential Information concerning Plaintiff's contract with a key customer. (DE 21 at 9; DE 21-2 at ¶17). Further, Plaintiff alleges that a customer with a close, personal relationship with Defendant provided, within the week prior to Defendant's formal resignation, nearly one-year's advance notice that it would be "non-renewing its long term supply contract with [Plaintiff] to go with another provider with 'better pricing.'" (DE 21 at 8). Plaintiff also alleges that it has encountered unspecified incidents with suppliers pushing unexpectedly for price increases. (DE 21 at 9). Additionally, Plaintiff alleges that, subsequent to the Stipulated Order, Defendant announced on Linked-In that he had attended TW Metals' Global Sales meeting, which Plaintiff contends placed Defendant in a position to use and disclose Plaintiff's Confidential Information. (DE 21 at 9). Thus, Plaintiff posits that Defendant has demonstrated a proclivity to share Confidential Information with TW Metals.

### 4. **Deceitful Conduct**

Moreover, the Motion for Preliminary Injunction argues that Defendant has engaged in deceitful conduct "to cover his tracks." (DE 21 at 8). In spite of a demand to preserve evidence from Plaintiff's counsel on January 8, 2021, forensic evidence reflects that Defendant deleted all calls but one from his personal cell phone before the phone was imaged at 5:35 PM on February 3, 2021, including a call that a forensics investigator made to him at 3:30 PM on February 3, 2021. (DE 21-2 at ¶17; DE 21-3 at ¶18). The FI Declaration states that "[n]o other call logs were recoverable" and attests to an inability to analyze Defendant's other call logs due to Defendant's deletions. (DE 21-3 at ¶18). On this record, Plaintiff thus established that Defendant deleted one phone call from the forensic investigator in violation of the Stipulated Order.

In addition, Plaintiff's forensic investigation determined that Defendant first copied and then deleted business files containing Confidential Information at suspect times.  First, Defendant copied 2,900 files to a personal external storage drive on December 3, 2020, including the Sales History File and the 2020 Global Sales Meeting File, after conditionally accepting employment with TW Metals on November 30, 2020.  (DE 21 at 7-8; DE 21-2 at ¶16; DE 21-3 at ¶14).  Then, on January 8, 2021, two days following Plaintiff's suspension of Defendant pending investigation, Defendant deleted the Sales History File, along with approximately 50,000 other files, including the 2020 Global Sales Meeting File, from his personal external storage drive.  (DE 21 at 8; DE 21-2 at ¶16; DE 21-3 at ¶17).  Plaintiff contends that the timing of Defendant's deletions here is particularly troublesome because they did not occur after he formally announced his resignation but only after Plaintiff suspended Defendant pending investigation.  (DE 21 at 8).  In addition to the aforementioned deletions, Plaintiff's forensic investigator determined that Defendant deleted the entire browsing history on his work computer on January 5, 2021.  (DE 21 at 8-9; DE 21-3 at ¶16).  Plaintiff further alleges that Defendant deleted part of the call history from his work phone, but Defendant has been able to identify calls from billing records, which led to Plaintiff identifying the previously noted 30-plus minute call to a key supplier.  (DE 21 at 8-9).

Plaintiff's Motion for Preliminary Injunction argues that the court may grant an injunction to prevent actual or threatened misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(A)(i) and that Florida, Illinois, and Pennsylvania similarly provide for injunctive relief to prevent actual or threatened misappropriation of trade secrets.[10]  (DE 21 at 9-10).

---

[10] Plaintiff argues that TW Metals is headquartered in Pennsylvania, and Defendant has acted on behalf of TW Metals.  (DE 21 at 10, n.8).  Nonetheless, even if true, TW Metals is not a party to this action, and Plaintiff has failed to sufficiently allege that Defendant has acted as an agent of

### iv.   The Evidentiary Hearing Briefs

Prior to the Evidentiary Hearing, the parties filed pre-hearing briefs.  (DE 56; DE 60).  Plaintiff posited that it would show: (i) that its Confidential Information was entitled to trade secret protection; (ii) that Defendant acquired knowledge of its Confidential Information while working for Plaintiff; and (iii) that, in acquiring employment with TW Metals, Defendant took actions giving rise to a risk of threatened misappropriation of its Confidential Information, which compels the Court to grant Plaintiff's Motion for Preliminary Injunction.  (DE 60).  Defendant, on the other hand, argued that Plaintiff is inappropriately seeking to prohibit Defendant from working for TW Metals without having the benefit of a non-compete agreement and averred that Defendant would show that Plaintiff had no factual basis to seek such an injunction.

Following the Evidentiary Hearing, the parties filed post-hearing briefs.  (DE 103; DE 88).[11]   Plaintiff's brief argued that the evidence presented at the Evidentiary Hearing demonstrated that a substantial threat of misappropriation of trade secrets exists by virtue of Defendant working as an executive for direct competitor TW Metals in a position that TW Metals custom-made for him involving overlapping and competitive lines of business.  (DE 103 at 2).  Further, Plaintiff argued that the facts presented pertaining to Defendant's actions prove his motivation and inclination to harm Plaintiff in disregard of the Confidentiality Agreement.  *Id.*

---

TW Metals.  Therefore, I do not find that Plaintiff has established a basis for Pennsylvania law to apply in this case and do not discuss Pennsylvania law further.

[11] Plaintiff initially filed its post-hearing brief under seal and later filed a redacted brief.  (DE 89; DE 103).  I discuss the facts cited by Plaintiff in general terms so as to avoid the necessity of filing this Report and Recommendation under seal, and I also cite to Plaintiff's redacted brief for this reason.  However, the parties have leave to file a motion to seal this Report and Recommendation should either side deem it necessary.

In particular, Plaintiff argued that, because misappropriation can be difficult to prove in trade secret cases, courts find that circumstantial – rather than direct – evidence is sufficient.  *Id.* (citing *Stratienko v. Cardis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005) (permitting "an inference of use from evidence of access and similarity [of design]" to establish a misappropriation claim pertaining to the design of a medical device on grounds that a plaintiff can rarely prove such misappropriation through direct evidence)).   Plaintiff argued that direct and circumstantial evidence exists here in support of its misappropriation claim as follows: (1) Defendant repeatedly violated the Confidentiality Agreement; (2) Defendant collected Plaintiff's trade secrets in anticipation of his employment with TW Metals; (3) Defendant tried to delete the evidence of his collection of trade secrets after he was subject to investigation; (4) Defendant's knowledge about Plaintiff and its business methods was a significant consideration in TW Metals decision to hire Defendant because TW Metals hired Defendant to improve their business; (5) TW Metals' employees repeatedly solicited Confidential Information from Defendant; and (6) TW Metals imposed virtually no safeguards to prevent Defendant from using or disclosing Plaintiff's Confidential Information.  *Id.* at 2-3.

Defendant, on the other hand, argued that Plaintiff's demand for an injunction was merely based on speculation and conjecture and that Plaintiff did not meet its burden of proof at the Evidentiary Hearing to establish a likelihood of success on its claims for breach of contract or its statutory claims for misappropriation.  (DE 88 at 2-9).  Defendant also argued that Plaintiff had demonstrated no harm, let alone irreparable harm.  *Id.* at 10.  Additionally, Defendant argued that the harm to him from precluding his employment with TW Metals outweighs Plaintiff's fear of future harm.  *Id.* at 10-11.  Further, Defendant argued that the public interest is not served by

Plaintiff's requested injunctive relief because enjoining Defendant's employment prevents lawful competition and contradicts Florida' public policy and the legislative intent of the DTSA.

For reasons further discussed below, I do not find that Plaintiff has demonstrated that Defendant should be enjoined from working for TW Metals "or any other direct competitor" of Plaintiff as the Motion for Preliminary Injunction requests.  (DE 21-4 at 3).  I conclude, however, that continuation of the Stipulated Order is appropriate and set forth below findings of facts and conclusions of law in support thereof.

**B.  Findings of Fact**

In support of continuing the Stipulated Order, I find that the following facts have been established by a preponderance of the evidence[12]:

1.  Defendant has worked in the specialty metals and aerospace industry for more than 25 years.  (DE 75 at 256:19-23; 301:20-304:15).

2.  Defendant, employed by Plaintiff for more than thirteen (13) years, worked for Plaintiff in a key executive sales position prior to his resignation.  (DE 21 at 4; DE 23 at ¶¶19-20; DE 32; DE 75 at 93:7-9).

3.  On March 21, 2019, Defendant executed and delivered a confidentiality agreement ("Confidentiality Agreement") that is referenced in the Stipulated Order issued on January 26, 2021 by the Court.  (DE 17-1; DE 18).  The Confidentiality Agreement requires Defendant to maintain the confidentiality of, and not use for his own benefit, Plaintiff's Confidential Information.  (DE 17-1 at 2; DE 21 at 5).  In this regard, the Confidentiality

---

[12] *See Carbone v. Ocean Breeze Recovery, LLC*, No. 15-61700-CIV, 2015 WL 11201203, at *1, n.1 (S.D. Fla. Oct. 7, 2015) (Cohn, J.) (applying a preponderance of the evidence standard and citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) for the proposition that findings of fact and conclusions of law made in connection with an order granting a preliminary injunction are not binding at a trial on the merits).

Agreement states that "[t]he phrase 'confidential information and trade secrets' includes, but is not limited to the following:"

- Inventions, discoveries, processes, methods, designs, and improvements not yet patented or published, computer source code, and research and development data.

- Business information such as product costs, vendor and customer lists, lists of approved components and sources, unpublished price lists, production schedules, business and marketing plans, sales figures, and other financial information not yet announced or publicly disclosed.

- Any other information not generally available to the public or to competitors of the Company or its affiliates which, if disclosed, would materially damage the Company or its affiliates or would aid or benefit a competitor.

(DE 17-1 at 2).  Other relevant provisions of the Confidentiality Agreement include:

    a.   A choice of law provision stating as follows:

GOVERNING LAW AND VENUE. This Agreement shall be construed, and the relationship between the parties determined, in accordance with the laws of the State of Illinois, notwithstanding any choice-of-law principle that might dictate a different governing law. Each party irrevocably agrees, consents, and submits to jurisdiction and venue in the federal and state courts located in Cook County, Illinois, *with respect to any dispute arising out of or relating in any way to this Agreement*.  (DE 17-1 at 4; DE 18) (emphasis added).

    b.   A Non-Solicit and Non-Interference provision stating, in relevant part, that "during employment and for a period of two years following the conclusion of employment with the Company, [Defendant] shall not interfere with or adversely affect the Company's relationships with any customer or other entity with which [Defendant] did business or had personal contact in performing duties for the Company."  (DE 17-1 at 2; DE 18; DE 23-1 at 14).

4. Plaintiff did not have a noncompete agreement with Defendant.  (DE 75 at 229:20-231:15; 320:9-17).

5. By virtue of his employment with Plaintiff, Defendant acquired knowledge of, and had access to, Confidential Information of Plaintiff as defined in the Confidentiality

20

Agreement and the Stipulated Order.  (DE 17-1; DE 18; DE 75 at 106:21-22; 109:10-15; 111:4-12; 113:23-114:4; 115:24-116:1; 116:22-120:22; 137:15-21; 172:8-174:12).

6. In some cases, Plaintiff has changed its business strategies relating to business development and pricing since Defendant left Plaintiff's employment, and Defendant is without knowledge of those changes.  (DE 75 at 229:20-233:6).

7. Defendant was unhappy with his employment at Plaintiff for several reasons, including because he was passed over for the position of president twice in the two years before Mr. John J. Buckridge was promoted to president in September 2020 and because he was concerned that Plaintiff was positioning to replace him.  (DE 23-1 at ¶¶3-5; DE 75 at 120:23-122:18; 165:10; 204:9-208:7; 307:7-314:25).

8. Beginning in August of 2020, Defendant explored buying into a franchise and other business opportunities to own a business or otherwise find alternative employment prior to accepting an offer of employment from TW Metals.  (DE 75 at 315:1-319:6).

9. Defendant reached out to the Vice President of Sales and Marketing at TW Metals in late September 2020 to inquire about employment with TW Metals.  (DE 75 at 114:21-115:7).

10. Defendant sent his Resume to TW Metals on October 14, 2020, which disclosed Plaintiff's profit margins and earnings substantially identical to actual results.  (DE 75 at 139:12-140:23; DE 21-2 at ¶¶9-10; DE 21-3 at 69).  Mr. Buckridge attested that he had no facts to suggest that TW Metals had used the information that Defendant disclosed in his Resume to compete with Plaintiff.  (DE 75 at 240:4-7).  When previously seeking employment with Plaintiff, Defendant had also disclosed his then-employer TW Metal's gross profit information in a resume that he submitted to Plaintiff's recruiter.  (DE 58-3; DE 75 at 306:17-25).

11. Defendant implied in the Resume sent to TW Metals on October 14, 2020 that, using his experience, he could assist TW Metals acquire raw materials at better pricing, and the job description that TW Metals provided to Defendant with its offer of employment included a responsibility to assist TW Metals in this regard.  (DE 21-3 at 17, 56-63; DE 75 at 141:9-142:5).  Defendant's Resume also touted his experience in the maintenance, repair and overhaul ("MRO") part of the aerospace business.  (DE 75 at 169:15-21; DE 21-3 at 17, 56-63).  Specifically, Defendant stated in his Resume that he "[c]reated [Plaintiff's] Aircraft MRO business in 2009," and that "[Plaintiff] is now the global leader in the distribution of raw materials used by airlines and MRO service providers globally." (DE 21-3 at 57).  Part of the job description that TW Metals provided to Defendant included working to grow international opportunities and to develop MRO strategies in its European facilities.  (DE 21-3 at 17, 56-63; DE 75 at 142:6-10).  The President and CEO of TW Metals, Mr. Kirk Moore, attested that he believed Defendant could assist TW Metals in becoming more intentional with its acquisition strategy.  (DE 75 at 256:14-16). Defendant indicated, in his interview with Mr. Moore, that an employee of Plaintiff's in Europe would be open to joining TW Metals.  (DE 75 at 142:11-25).

12. On November 3, 2020, Defendant disclosed the Confidentiality Agreement to TW Metals and then received, on November 23, 2020, TW Metals' offer of employment conditioned on Defendant's satisfactory completion of TW Metals' pre-employment screening protocols, which conditions TW Metals confirmed as satisfied on December 28, 2020. (DE 21-3 at ¶13, pp. 15-52; DE 75 at 255:9-256:5; 260: 4-12; 261; 4-7; 298:21-25; 322:15-324:11).

13. On December 3, 2020, Defendant copied 2,900 files to a Seagate external storage drive, many of which were personal, but which included a file labeled "SLS.xlsx," which contained detailed sales for more than ten years including the gross margin on each type of sale and a 2020 Global Sales PowerPoint document. (DE 21-2 at ¶¶15-16; DE 21-3 at ¶14; DE 75 at 41:11-46:15; 52:21-53:3; 100:17-101:18). Defendant transferred the files in preparation for leaving Plaintiff, and he transferred all of his personal files. (DE 75 at 333:24-334:10). Defendant was also reviewing, on December 3, 2020, end-of-month reporting that he received via email. (DE 75 at 334:11-16).

14. Since 2016, Defendant habitually saved documents from his company computer to the Seagate external storage drive for back up purposes. (DE 75 at 100:17-102:5; 332:17-23).

15. Defendant also regularly saved files to his desktop, which were organized by year and were visible to Mr. Buckridge when Defendant shared his desktop during meetings with Mr. Buckridge. (DE 75 at 331:12-332:6). Mr. Buckridge never objected to Defendant having files on his desktop. (DE 75 at 332:7-9). Defendant saved files on his desktop for accessibility purposes because Plaintiff's retention policy caused all emails to be deleted after 12 months, and anything that was shared with Defendant not from Plaintiff's centralized system or saved elsewhere might not be recoverable. (DE 75 at 332:10-16).

16. Defendant resigned from his position with Plaintiff on January 4, 2021 giving two weeks' notice. (DE 23-1 at ¶ 19; DE 32).

17. Within the week prior to Defendant's January 4, 2021 resignation, a customer of Plaintiff having a close personal relationship with Defendant notified Plaintiff close to one-year in advance of contract expiration that, due to better pricing from another provider, it would not be renewing its long-term supply contract with Plaintiff ("Non-Renewing Customer").

(DE 21 at 8).  Defendant attested that he had no involvement in causing the Non-Renewing Customer not to renew.  (DE 75 at 337:19-339:6).  Mr. Buckridge attested to being unaware of any facts suggesting that Defendant caused the Non-Renewing Customer not to renew.  (DE 75 at 213:6-214:3).

18. On January 4, 2021, after drafting his resignation letter, Defendant printed an email with customer pricing information for two customers and revenue and margin information of Plaintiff.  (DE 21-3 at ¶15; DE 21 at n.4; DE 23-1 at ¶30(d)).  Defendant was still working for Plaintiff at the time he printed the information, and it was normal business practice for employees to print a document addressed to them.  (DE 75 at 238:15-239:22).  Defendant communicated to Plaintiff subsequent to the Complaint that he printed the information for a specific meeting and shredded it afterwards.  Defendant provided Plaintiff with shredded documents and maintained that he did not print anything else.  (DE 21 at n.4).  Plaintiff did not contend at the Evidentiary Hearing that Defendant had shared the pricing information he printed with TW Metals.  To the contrary, Mr. Buckridge attested to being unaware of Defendant disclosing Confidential Information to TW Metals except for the information in the Resume that Defendant sent to TW Metals on October 14, 2021. (DE 75 at 239:23-240:7).

19. Shortly after Defendant tendered his resignation, Plaintiff reported that a supplier raised prices, which Plaintiff attributed to Defendant's actions.  (DE 75 at 214:4-226:25). Plaintiff, however, was unable to proffer facts to suggest that Defendant had caused the subject supplier, or any supplier, to raise prices.  (DE 75 at 214:4-226:25; 243:6-24). Plaintiff also acknowledged that there are specific instances of suppliers raising pricing as a matter of course during the relevant timeframe.  (DE 75 at 223:19-23).

20. Plaintiff placed Defendant on suspension on approximately January 6, 2021, pending investigation. (DE 21-2 at ¶16; DE 32). Defendant only became aware that he was under investigation on January 7, 2021, when Mr. Buckridge responded to Defendant's inquiry regarding the confiscation of his computer and phone by Plaintiff's representatives at his home on the evening of January 6, 2021. (DE 75 at 147:7-12; 327:22-329:8).

21. Plaintiff's billing records indicate that Defendant made multiple calls to, and had a 30-plus minute call with, a key material supplier of Plaintiff on January 6, 2021 (the "Call"). (DE 21 at 9; DE 21-2 at ¶17; DE 75 at 174:13-176:1). Since the Call, the key supplier engaged in behavior suggesting that the supplier had recently acquired Confidential Information pertaining to a contract that Plaintiff has with a key customer. (DE 21 at 9; DE 21-2 at ¶17). Defendant attested that he did not disclose terms of the customer contract with the subject supplier. (DE 75 at 337:19-339:6). Furthermore, as of the Evidentiary Hearing, Plaintiff had "no factual basis to represent to [the] Court that [Defendant] shared the terms of the [key customer contract] with [the supplier]." (DE 75 at 222:21-223:3).

22. Plaintiff's counsel sent Defendant a demand to preserve evidence on January 8, 2021. (DE 21-2 at ¶17).

23. Defendant deleted more than 50,000 files from the Seagate drive on January 8, 2021, including the SLS.xlsx file and the 2020 Global Sales PowerPoint file. (DE 75 at 46:16-47:25). Defendant last opened the SLS.xlsx file on January 8, 2021 prior to deleting it. (DE 75 at 52:21-53:3). Defendant deleted everything on the Seagate drive in anticipation of being accused of nefarious conduct and because he had no business purpose for retaining records on the external drive as he was unable to access Plaintiff's systems or communicate with Plaintiff's employees. (DE 75 at 334:22-335:3).

24. Defendant's counsel at the time communicated to Plaintiff on January 11, 2021 that Defendant "had previously destroyed all materials in his possession," which included his deletion of 50,000 or so files from Defendant's external Seagate storage drive.  (DE 75 at 333:15-337:9; DE 58-23).

25. Plaintiff's forensic examination began on January 13, 2021.  (DE 21-3 at ¶7; DE 75 at 335:18-20).  As part of the forensics examination, Defendant's personal cell phone was imaged on February 3, 2021.  (DE 21-3 at ¶18).  Among other findings, the forensics examiner determined that the call history on Defendant's personal cell phone had been deleted prior to Defendant submitting it for examination.  (DE 75 at 53:14-57:13). Defendant deleted the call that the forensics examiner made to him at 3:30 PM on February 3, 2021 before the phone was imaged at 5:35 PM on February 3, 2021 ("Forensics Examiner's Call").  (DE 21-3 at ¶18).  The deletion of the Forensics Examiner's Call was in contravention of this Court's Stipulated Order issued on January 26, 2021, which included, *inter alia*, a direction to "preserve all electronic information in his possession or control pertaining to Future Metals."  (DE 18 at ¶7).

26. Plaintiff established at the Evidentiary Hearing that Defendant continued to communicate with Plaintiff's customers and suppliers after Plaintiff suspended Defendant and after Defendant began working for TW Metals.[13]  (DE 103 at 4-5 (citing sealed exhibit M-112 at "Voicemails" tab); DE 75 at 91:11-22; 147:16-148:1).

---

[13] I find that Plaintiff is entitled to the inference being made in its favor that Defendant had calls to and/or from customers and suppliers on his personal phone because Defendant deleted *all* the call history on his personal cell phone prior to submitting it for forensic examination.  *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020), *cert. denied*, 209 L. Ed. 2d 549 (Apr. 19, 2021).

27. Defendant began working for TW Metals on January 18, 2021 in the position of Director of Global Aerospace Products.  (DE 75 at 301:2-5).

28. Both Plaintiff and TW Metals serve the aerospace industry with respect to specialty metals distribution.  (DE 75 at 191:11-16).  TW Metals, with a worldwide base of approximately 850 employees, also distributes specialty metals in industries outside of aerospace.  (DE 75 at 191:20-23).   Furthermore, within aerospace, TW Metals distributes metals outside of high temperature tubing and MRO.  (DE 75 at 193:24-194:1).  Plaintiff employs about 104 employees, and its involvement in the aerospace industry is primarily in high temperature tubing and MRO, including with respect to the military.  Approximately 60% to 70% of Plaintiff's business is derived from high temperature tubing.  (DE 75 at 167:17-19; 192:12-193:7).   There are also other, smaller competitors besides Plaintiff and TW Metals in the aerospace metal tubing industry.  (DE 75 at 194:1-15).  Tubing is about 40% of TW Metals' aerospace business and 60% is bar, plate, sheet and extrusions.  (DE 75 at 253:11-19).

29. Mr. Moore had informed the senior leadership team at TW Metals, on or about January 8, 2021, that Defendant would be starting employment with TW Metals and that Defendant had a non-disclosure agreement with Plaintiff and could not share information about Plaintiff's customers or interfere with Plaintiff's suppliers.  (DE 75 at 261:10-262:1).

30. Defendant received emails from employees at TW Metals asking him questions about Plaintiff's customers. (DE 75 at 123: 15-25).

31. Defendant attested at the Evidentiary Hearing that he did not attempt to interfere with Plaintiff's customers or suppliers and also testified that he did not disclose Confidential

Information to any customers or suppliers that would affect Plaintiff's relationships. (DE 75 at 337:11-18).

32. Mr. Buckridge could not, as of the Evidentiary Hearing date of June 2, 2021, identify any business lost as a result of Defendant working for TW Metals. (DE 75 at 210:19-211:10). Mr. Buckridge also testified that he could not identify any customer or supplier that had communicated to Plaintiff that Defendant solicited them for business since he left Plaintiff's employ. (DE 75 at 213:1-5). Mr. Buckridge also testified that he had answered interrogatories stating that actual interference by Defendant with Plaintiff's customer or other relationships was unknown, and Mr. Buckridge proffered no facts to suggest that Plaintiff had determined otherwise since answering the interrogatories. (DE 75 at 241:11-19).

33. Plaintiff's ability to successfully compete in providing aerospace products depends upon its 50-year history of knowing its customers and matching that knowledge to work with various mills and suppliers to sell products under long-term agreements, which go out five years. Relationships with outside labs and test houses with respect to its MRO business is also critical. In addition, location of inventory and decisions about forward stocking of inventory for responsive delivery is critical. Plaintiff maintains the confidentiality of its agreements with customers and suppliers and does not announce acquisitions or its operating income. (DE 75 at 167:15-174:12; 210:24-211:1).

34. Mr. Moore, the President and CEO of TW Metals, agreed that TW Metals has no written structure in place to ensure Defendant's compliance with the Confidentiality Agreement and that he is relying on Defendant. (DE 75 at 280:3-18).

35. However, Mr. Moore attested that Defendant reports directly to him, that he had numerous conversations with Defendant about complying with the Confidentiality Agreement, that he wanted Defendant to feel comfortable that he, as President and CEO of TW Metals, would handle any pressure from anyone relative to sharing information that would contravene the Confidentiality Agreement, and that in-house counsel for TW Metals' parent company sent correspondence to Plaintiff advising that it intended to comply with the Confidentiality Agreement.  (DE 75 at 248:1-17; 252:13-14; 254:9-264:14; 279:16-17).

36. In-house counsel for TW Metals' parent company also requested that Plaintiff provide any evidence that it acquired to prove noncompliance so that it could investigate such allegation.  As of the Evidentiary Hearing, TW Metals had received no proof of noncompliance from Plaintiff.  (DE 75 at 263:21-266:13).

## **LEGAL STANDARD**

"[B]oth temporary restraining orders and preliminary injunctions as those terms are used in the Federal Rules of Civil Procedure . . . serve to maintain the status quo until a final decision on a matter can be reached."  *United States v. DBB, Inc.*, 180 F.3d 1277, 1282 (11th Cir. 1999); *see also Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (discussing that the focus in maintaining the status quo is on preventing irreparable injury).[14]  As the Supreme Court has instructed:

> Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a

---

[14] "In *Bonner v. City of Prichard*, [the Eleventh Circuit] adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981." *Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1310 n.5 (11th Cir. 2020) (citing *Bonner*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc)).

> trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing[,] and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. In light of these considerations, it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (internal citations omitted).

"Rule 65(d) requires both a TRO and a preliminary injunction to 'state the reasons why it issued." *H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 845 (7th Cir. 2012); *see also* Fed. R. Civ. Proc. 65(d)(1)(A). "Rule 52(a)(2) requires a statement of findings of fact and conclusions of law for decisions granting or refusing an 'interlocutory injunction' (a phrase that includes preliminary injunctions)." *H-D Michigan, LLC*, 694 F.3d at 845; *see also* Fed. R. Civ. Proc. 52(a)(2).

"A district court may issue a preliminary injunction where the moving party demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Id.* (internal quotations omitted).

## CONCLUSIONS OF LAW

As discussed further below, I find that Plaintiff has failed to carry its burden to demonstrate that the Court should grant its motion to enjoin Defendant from working for TW Metals or direct competitors. However, continuing the Stipulated Order for two years[15] from the date of Defendant's termination of employment with Plaintiff is appropriate in light of the evidence presented at the Evidentiary Hearing.

### I. Choice of Law

As an initial matter, the parties acknowledge executing a Confidentiality Agreement that includes a choice of law provision stating that it is governed by Illinois law. (DE 17-1 at 4; DE 18). A federal court exercising supplemental jurisdiction over state-law claims applies the choice-of-law rules of the state in which it sits, in this case Florida. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). "Under Florida law, contractual choice-of-law provisions are presumptively enforceable." *Viridis Corp. v. TCA Glob. Credit Master Fund, LP*, 721 F. App'x 865, 873 (11th Cir. 2018) (citing *Default Proof Credit Card Sys., Inc. v. Friedland*, 992 So. 2d 442, 444 (Fla. 3d DCA 2008)). A party may rebut this presumption "by showing that a provision contravenes the strong public policy of Florida or is unjust or unreasonable." *Id.* "The term 'strong public policy' means that the public policy must be sufficiently important that it outweighs the policy protecting freedom of contract." *Id.* (quoting *Walls v. Quick & Reilly, Inc.*, 824 So. 2d 1016, 1018 (Fla. 5th DCA 2002). A choice-of-law analysis, however, is not required where there is a "false conflict," i.e., the laws of the jurisdictions at issue would produce the same result. *See*

---

[15] The Confidentiality Agreement that Defendant signed provides for non-solicitation and non-interference for a term of two years following termination of employment. (DE 21-1 at 2).

*Ritter v. Metro. Cas. Ins. Co.*, No. 4:19-CV-10105-KMM, 2020 WL 6271171, at \*2 (S.D. Fla. Sept. 30, 2020) (collecting cases).

Here, I find, as I did in my last Report and Recommendation (DE 38), that Illinois law applies to Plaintiff's breach of contract claim. Indeed, Defendant has acknowledged that Plaintiff's breach of contract claim is governed by Illinois law. (DE 77 at n.1).

However, I now find that Illinois law, as well as Florida law, may apply to Plaintiff's misappropriation claim.[16] Plaintiff has pled in the alternative its state-law claim for misappropriation of trade secrets under both Illinois and Florida law.[17] (DE 101). Defendant has argued, however, that the choice-of-law provision does not extend beyond Plaintiff's contract claims to encompass Plaintiff's state-law claim for misappropriation of trade secrets. (DE 77 at n.1.). Additionally, Defendant has argued that Plaintiff does not satisfy Florida's "most significant relationship" test for Illinois law to otherwise apply to Plaintiff's misappropriation claims. (DE 77 at 1-10). Plaintiff has argued that a choice-of-law determination as to whether Illinois law applies is premature at this stage of the proceedings. (DE 84). I agree that it is premature to *conclude* whether Illinois law applies and proceed by setting forth the reasons why Illinois law *may* apply.

---

[16] In granting Plaintiff's Motion for Leave to Amend Complaint to Add Claim for Violation of Illinois Trade Secret[s] Act, I concluded that it was premature to decide the choice-of-law question to deny the motion based on futility. Additionally, I could not conclude at that time that applying Illinois law would violate Florida's public policy. (DE 98). Likewise, I do not decide the choice-of-law question at this juncture; rather, I find that the analysis pertaining to injunctive relief properly considers both Illinois and Florida law. Indeed, the parties have yet to fully brief the choice-of-law issue.

[17] As discussed *supra*, I find that Pennsylvania law does not apply in this case and do not analyze Plaintiff's misappropriation claim under Pennsylvania law.

Both Plaintiff and Defendant acknowledge that Illinois law and Florida differ in that Illinois law clearly invokes the applicability of the inevitable disclosure doctrine with respect to Plaintiff's misappropriation claims.[18]  Therefore, I conclude that a true conflict exists.  As such, a choice-of-law determination is necessary as to whether Illinois law applies or not.

"In determining whether a choice of law clause contained in a contract between two parties also governs tort [or other non-contract based] claims between those parties, a court must first examine the scope of the provision."  *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009).  "If the choice-of-law provision of the agreement is narrow, it only governs claims relating to the contract."  *Viridis Corp. v. TCA Glob. Credit Master Fund, LP*, 721 F. App'x 865, 875 n.11 (11th Cir. 2018) (citing *Cooper*, 575 F.3d at 1162).  A "broad choice-of-law provision . . . refer[s] 'to any and all claims or disputes arising out of' an agreement."  *Id.* (quoting *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1300 (11th Cir. 2003)).  A choice-of-law clause "refer[ing] to . . . any and all claims or disputes arising out of the relationship of the parties" is also considered a broad clause.  *See Green Leaf Nursery*, 341 F.3d at 1300-01.

Here, the choice-of-law provision in the Confidentiality Agreement states that "[t]his Agreement shall be construed, and *the relationship between the parties determined*, in accordance with the laws of the State of Illinois, notwithstanding any choice-of-law principle that might dictate a different governing law." (DE 17-1 at 4) (emphasis added).  The subject choice-of-law provision lacks the "arising out of" language or similar language that would signal an intention to apply Illinois law to causes of action other than those pertaining to the Confidentiality Agreement itself.

---

[18] Plaintiff's Motion for Preliminary Injunction footnotes that "Florida has not adopted or declined to adopt the inevitable disclosure standard." (DE 21 at n.8) (citing *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, n.12 (11th Cir. 2009)).  Defendant has argued that no Florida court or Federal court seated in Florida has applied the inevitable disclosure doctrine. (DE 77 at 12).

While the clause is somewhat broadened by its application to determine the parties' relationship, I conclude that it fails to encompass all disputes that might result from the contractual relationship between the parties. Therefore, consistent with my previous Report and Recommendation, I find that the choice-of-law clause is narrow and does not extend to the misappropriation claims. (DE 38 at 28). Even if the choice-of-law provision does not extend to the misappropriation claims, however, Plaintiff may be able to apply Illinois law to its misappropriation claims if it satisfies Florida's most significant relationship test.[19] *Jeffers v. Kerzner Int'l Hotels Ltd.*, 319 F. Supp. 3d 1267, 1270 (S.D. Fla. 2018) (citing *Grupo Televisa, S.A. v. Telemundo Commc'ns. Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007)). Therefore, for purposes of determining the appropriateness of injunctive relief, I analyze the misappropriation claims under both Illinois and Florida law.

## II.   **Preliminary Injunction**

Plaintiff's Motion for Preliminary Injunction does not address its breach of fiduciary duty and computer fraud and abuse claims. Therefore, I limit my analysis to Plaintiff's breach of contract and misappropriation of trade secrets claims. *See* (DE 21 at 9-21). Specifically, I find that Plaintiff's evidence pertaining to a breach of contract does not support injunctive relief; however, the evidence does indicate that Plaintiff is entitled to injunctive relief in the form of a

---

[19] To the extent the issue of misappropriation sounds in tort, Florida resolves the question according to the most significant relationship test. *See Jeffers v. Kerzner Int'l Hotels Ltd.*, 319 F. Supp. 3d 1267, 1270 (S.D. Fla. 2018). Under this test, the rights and liabilities of the parties are determined by the law of the state which has the "most significant relationship" to the occurrence and the parties. *See Grupo Televisa, S.A. v. Telemundo Commc'ns. Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). To determine the state with the "most significant relationship," courts must consider: "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." *Jeffers*, 319 F. Supp. 3d at 1270 (S.D. Fla. 2018).

continuation of the Stipulated Order with respect to its misappropriation claims. I turn first to Plaintiff's breach of contract claim before turning to its misappropriation of trade secrets claims.

## A.  **Breach of Contract**

"To state a breach of contract claim under Illinois law, [plaintiff] must allege (1) the existence of a valid and enforceable contract; (2) the plaintiff's performance of the contract; (3) the defendant's breach of the contract; and (4) resulting injury." *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 819-20 (N.D. Ill. 2014).  As noted previously, the parties do not dispute the enforceability of the Confidentiality Agreement nor Plaintiff's performance under that contract by employing Defendant.

As to breach, Plaintiff argued that Defendant breached the agreement in at least five ways: (1) Defendant shared Plaintiff's earnings performance in 2019 and the trend of current sales with TW Metals' Vice President of Sales and Marketing prior to making TW Metals aware of the Confidentiality Agreement (DE 103 at 3; DE 75 at 14:5-16:11); (2) Defendant shared Confidential Information with the President and CEO of TW Metals via the Resume that he sent to TW Metals (DE 103 at 4; DE 75 at 139:12-140:23; DE 21-2 at ¶¶9-10; DE 21-3 at 69); (3) Defendant admitted that his TW Metals' job description included developing MRO strategies in the European facilities and that he communicated in his interview with TW Metals' President and CEO that another employee of Plaintiff in Europe would be open to joining TW Metals (DE 103 at 4; DE 75 at 142:11-25); (4) Defendant had a close relationship with a key contact at a supplier of Plaintiff, Defendant admitted talking to the subject key contact two days after his suspension from Plaintiff, and the key contact indicated to Mr. Buckridge that he knew the duration of Plaintiff's contract with a significant customer (DE 103 at 4; DE 75 at 174:13-175:25; 221:21-222:3; 338:7-339:19); and (5) Defendant continued fielding calls from Plaintiff's customers and suppliers after he was

suspended and began working at TW Metals (DE 103 at 4-5 (citing to sealed exhibit M-112); DE 75 at 53:14-57:13; 88:16-25; 91:11-92:22; 147:7-150:11)).  (DE 103 at 4-5 (citing to sealed exhibit M-112 at "Voicemails" tab)); DE 75 at 91:11-92:22; 147:16-148:1).  Plaintiff additionally argues that it proved that Defendant attempted to "mine and steal" its Confidential Information and then engaged in conduct demonstrating that he sought to cover his tracks.

Plaintiff, however, failed to establish any breaches of the Confidentiality Agreement nor any injury resulting from alleged breaches.  Plaintiff has even been invited by TW Metals to report breaches of the Confidentiality Agreement by Defendant and has not reported any.  (DE 75 at 263:21-266:13).  Furthermore, while I find that Plaintiff has established by a preponderance of the evidence that Defendant suggested to TW Metals' President Mr. Moore that he could hire an employee of Plaintiff in Europe, TW Metals did not pursue that suggestion.  (DE 75 at 248:1-17; 252:13-14; 254:9-264:14; 279:16-17).  As to Plaintiff's other alleged breaches, I do not find that they constitute breaches.  Although Plaintiff established that Defendant fielded calls from Plaintiff's customers and suppliers after he was suspended and began working for TW Metals, Plaintiff failed to establish that these calls were solicitations or interference in breach of the Confidentiality Agreement.  (DE 75 at 241:11-19).  Also, there is conflicting evidence about the confidentiality of the financial metrics information that Defendant shared with TW Metals' Vice President of Sales and Marketing and with respect to the resume that he sent to TW Metals.  (DE 75 at 140:10-24; 161:3-163:7; 171:8-23).  Plaintiff also failed to demonstrate that Defendant shared with a supplier the duration of Plaintiff's contract with a significant customer, and Plaintiff even acknowledged that there were no facts to substantiate this allegation.  (DE 75 at 222:21-223:3).  As to the allegation that Defendant "mined and stole" Plaintiff's confidential information, Defendant attests that he deleted information after it became clear to him that he was suspended,

would have no reason to continue possessing the information, and was going to have to defend against accusations of nefarious conduct.  (DE 75 at 147:7-12; 327:22-329:8; 334:22-335:3).  Given that Defendant deleted the information the day after he no longer had a business reason for retaining it, I find that Plaintiff failed to carry its burden to demonstrate a breach of the Confidentiality Agreement on the basis of Defendant copying and then deleting Plaintiff's business files to and from an external drive.  I also find it significant that, of the 2,900 files copied to the external hard drive, most of them were personal, and Plaintiff only points to two out of 2,900 files as evidence of what was "mined."  Furthermore, to the extent that Plaintiff could prove Defendant mined and stole its Confidential Information (and I do not find that Plaintiff did prove this), Plaintiff fails to demonstrate that the information was shared with TW Metals and fails to demonstrate any injury from Defendant's conduct.  (DE 75 at 210:19-211:10; 213:1-5; 241:11-19; 248:1-17; 252:13-14; 254:9-264:14; 279:16-17).    Plaintiff cannot satisfy the first factor for injunctive relief – a substantial likelihood of succeeding on the merits – with respect to its breach of contract claim.  *See Haitian Refugee Ctr., Inc. v. Christopher*, 43 F.3d 1431, 1432 (11th Cir. 1995) ("The requesting party's failure to demonstrate a 'substantial likelihood of success on the merits' may defeat the party's claim, regardless of its ability to establish any of the other elements.").  Plaintiff has also failed to demonstrate that it will suffer irreparable harm without injunctive relief due to a breach of contract.  Therefore, I conclude that breach of contract does not provide grounds to grant Plaintiff injunctive relief.

**B.  Trade Secret Misappropriation**

 Plaintiff brings claims for trade secret misappropriation under federal and state law.  In Count I of the Complaint, Plaintiff brings a trade secret misappropriation claim under the Defend Trade Secrets Act of 2016, which creates a private cause of action in favor of the "owner of a trade

secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  The DTSA defines trade secrets broadly as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).  Misappropriation of a trade secret under the DTSA means, *inter alia*, "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret."  18 U.S.C. § 1839(5)(B)(ii)(II)-(III).

To state a claim under the DTSA, a plaintiff must allege that it "(i) possessed information of independent economic value that (a) was lawfully owned by the plaintiff and (b) for which the plaintiff took reasonable measures to keep secret, and (ii) the defendant used and/or disclosed that information, despite (iii) a duty to maintain its secrecy."  *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1293 (S.D. Fla. 2018) (internal quotation marks omitted).  To obtain injunctive

relief under the DTSA, a plaintiff must prove "actual" or "threatened" misappropriation.  *See* 18 U.S.C. § 1836(3)(A)(i).

Florida and Illinois law also provide causes of action for the misappropriation of trade secrets.  *See Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018) (citing Fla. Stat. §§ 688.001-009); *Kim v. Dawn Food Products, Inc.*, 206 Fed. Appx. 558, 560 (7th Cir. 2006).  To prevail on a misappropriation claim in Florida and Illinois, the plaintiff must establish that the information at issue was a "trade secret" and that the defendant "misappropriated" that information.  *See Yellowfin Yachts, Inc.*, 898 F.3d at 1297; *Kim*, 206 Fed. App'x. at 560.  The terms "trade secret" and "misappropriate" are similarly defined under both states' versions of the Defend Trade Secrets Act.  *See* Fla. Stat. §§ 688.002(2), (4); 765 Ill. Comp. Stat. §§ 1605/2(b), (d).  And, to obtain injunctive relief under the FUTSA and ITSA, a plaintiff must prove that misappropriation was "actual" or "threatened."  *See* Fla. Stat. § 688.003; 765 Ill. Comp. Stat. § 1605/3.

However, as alluded to above, there is another doctrine utilized in Illinois and several other states that applies in the absence of "actual" misappropriation or an overt "threat" of misappropriation.  *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995); *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 148 F. Supp. 2d 1326, 1335 (S.D. Fla. 2001) (citing to *Redmond*).  This doctrine, known as the "inevitable disclosure" doctrine, allows courts to enjoin "threatened misappropriation . . . where there is a high degree of probability of inevitable and immediate . . . use of . . . trade secrets."  *See Redmond*, 54 F.3d at 1269 (internal citations omitted). This doctrine may even be applied in the absence of a non-compete agreement.  *See id.*  Florida courts have not yet adopted this doctrine.  *See Del Monte*, 148 F. Supp. 2d at 1337.

### i.   Whether Plaintiff Demonstrates a Substantial Likelihood of Success

"The first element, substantial likelihood of succeeding on the merits, is generally regarded as the most important because granting a motion for preliminary injunction would be inequitable if the movant does not have a chance of success on the merits." *Imagine Commc'ns Corp. v. Villegas*, 17-CV-20401, 2017 WL 10398556, at *2 (S.D. Fla. Nov. 29, 2017).  "In order to satisfy this element, the movant requires a showing of 'only likely, rather than certain, success.'" *Int'l Hair & Beauty Sys., LLC v. Simply Organic, Inc.*, 8:11-CV-1883-30AEP, 2011 WL 5359264, at *7 (M.D. Fla. Sept. 26, 2011), *report and recommendation adopted as modified*, 8:11-CV-1883-T-30AEP, 2011 WL 5360098 (M.D. Fla. Nov. 3, 2011) (citations omitted); *see also Life Spine, Inc. v. Aegis Spine, Inc*., 8 F.4th 531, 539 (7th Cir. 2021) (clarifying that "a plaintiff must demonstrate that its claim has some likelihood of success on the merits, not merely a better than negligible chance"); *Humana, Inc. v. Cushing*, 20-CV-61379, 2020 WL 5100061, at *4 (S.D. Fla. July 30, 2020) (stating that the inclusion of the word "substantial" should mean that plaintiff's likelihood of success "must be greater than the preponderance-of-the-evidence standard, or, in other words, more than fifty percent" but finding that the Eleventh Circuit's standard is whether a plaintiff can show it is "likely or probable" to prevail at trial).

I find that Plaintiff adequately alleges that its "[p]ricing, margins, customer contracts and pricing terms, pricing strategies, marketing plans, margins, performance, strategic plans, budgets, customer feedback, supplier assessments, acquisition plans, customer information, supplier information and pipeline information" are trade secrets.  (DE 21 at 14).  Plaintiff alleges that the information would be valuable in the hands of its competitors and that it took reasonable steps to maintain the confidentiality of such information.  (DE 101 at ¶¶3, 8, 10-18; DE 21 at 4).  Plaintiff also contends that the information is of the type that is recognized as a trade secret under federal,

Florida, and Illinois law.  (DE 101 at ¶¶18, 91; DE 21 at 4, 13-14).  Thus, Plaintiff demonstrates that the information it seeks to protect generally qualifies as a trade secret under federal, Florida, and Illinois law.  *See Fortiline, Inc. v. Moody*, 12-CV-81271, 2013 WL 12101142, at *3 (S.D. Fla. Jan. 7, 2013) (stating that customer lists and documents with pricing information are trade secrets); *APC Filtration, Inc. v. Becker*, 646 F. Supp. 2d 1000, 1010 (N.D. Ill. 2009) (stating that "names and addresses of contact persons of customers, potential customers, and suppliers," "customer-specific information, such as product preferences and deviated pricing," "details of pending sales quotations," and "cost and profit margin information" were all protectable trade secrets under the ITSA).

However, I find that Plaintiff has not sufficiently shown that Defendant has misappropriated or threatened to misappropriate any of this information under Florida law. Although Plaintiff claims that Defendant's actions in copying numerous confidential files to an external storage drive and deleting that information before he was terminated is evidence of misappropriation, (DE 21 at 14-16), Plaintiff has only pointed to two documents that were copied (out of 2,900) as evidence of misappropriation.  Moreover, while Defendant highlights the deletion of these files from the external storage drive as evidence of Defendant "covering his tracks" and having malintent, the deletion of these files from the external storage drive is also consistent with Defendant endeavoring to comply with his obligations under the Confidentiality Agreement. Indeed, the fact that the documents were deleted from the external storage drive also means (in absence of other evidence) that Defendant does not have the means to provide those documents to TW Metals.  Plaintiff also failed to establish direct evidence to support its contention that Defendant used these files to benefit himself or his new employer, TW Metals.  (DE at 213:1-5); *see Villegas*, 17-CV-20401, 2017 WL 10398556, at *11.  Plaintiff additionally claims that

Defendant shared its Confidential Information with several suppliers who have engaged in behavior indicating that they recently acquired Confidential Information.  (DE 21 at 9; DE 21-2 at ¶17).    However, Plaintiff failed to proffer facts to show that this behavior was the result of Defendant's actions.  (DE 75 at 214:4-226:25; 243:6-24).  The only confidential information that Plaintiff has sufficiently alleged that Defendant shared was the information in his resume regarding Plaintiff's profit margins and earnings.  (DE 75 at 239: 23-240:7).  But, as stated above, there is conflicting evidence about the confidentiality of this profit margin information.  (DE 75 at 140:10-24; 161:3-163:7; 171:8-23).

Despite this conclusion, I find that Plaintiff may succeed if the claim is evaluated under Illinois law.  *See Vendavo, Inc. v. Long,* 397 F. Supp. 3d 1115, 1129 (N.D. Ill. 2019); *Del Monte Fresh Produce Co.*, 148 F. Supp. 2d at 1336 (stating that Illinois law would be more favorable than Florida law regarding claims of misappropriation).  Because Illinois recognizes the inevitable discovery doctrine, Plaintiff may be able to succeed if it can show, by utilizing both direct and circumstantial evidence, that there is a "high degree of probability of inevitable and immediate . . . use of . . . trade secrets."  *See Redmond,* 54 F.3d at 1269; *See RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001) (same).   Here, there is a high likelihood that Defendant may disclose Plaintiff's Confidential Information, even if unintentionally, while working for TW Metals.  The Plaintiff and TW Metals are competitors in the aerospace industry and Defendant was hired with the expectation that he would grow TW Metals' MRO branch.  (DE 75 at 191:11-16, 141:5-8, 277:6-12).  Notably, during the Defendant's thirteen-year tenure with Plaintiff, he oversaw their entire MRO business in North America.  (DE 75 at 96:12-16).  Defendant also had "intimate" knowledge of Plaintiff's customers and strategies for pricing as he held several key executive and sales positions during his time with Plaintiff.  (DE 75 at 93:7-9, 113:4-117:3).  While developing

TW Metals' MRO division and serving on the company's pricing council, it would be difficult for Defendant not to rely on the information he was privy to as Plaintiff's employee to give TW Metals a competitive advantage over the Plaintiff.  *See Redmond*, 54 F.3d at 1269.  Further corroborating this claim, Defendant has also received inquiries from co-workers at TW Metals attempting to take advantage of his knowledge of Plaintiff's Confidential Information.  (DE 75 at 123: 15-25).  While there is no direct evidence to support a finding that Defendant provided Confidential Information in response to these inquiries, the inquiries provide circumstantial evidence necessary to prove there is at least a threat of misappropriation.  *See Redmond*, 54 F.3d at 1269; *RKI, Inc.*, 177 F. Supp. 2d at 876.  Other circumstantial evidence proving that there is a threat of misappropriation includes Defendant's (1) thirty plus minute conversation with a key material supplier after he resigned from Plaintiff and (2) deletion of one phone call in violation of the stipulated order.

TW Metals has attested that they are committed to complying with Defendant's Confidentiality Agreement and that Defendant's position is more strategic than tactical. (DE 75 at 257:15-23; 263:12-268:1); *see Vendavo, Inc. v. Long,* 397 F. Supp. 3d at 1129 (stating that courts will consider the following factors in determining whether a defendant will disclose secrets: the level of competition between the employers at issue, the employee's positions with both their old and new employers, and the actions the new employer has taken to prevent the employee from using or disclosing trade secrets); *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 927 (Ill. App. Ct. 2005) (same).   However, there is no written procedure to ensure compliance with the Confidentiality Agreement and it is utterly dependent upon Defendant.  (DE 75: 279:3-17).  Thus, if Defendant's access (both direct and indirect) to customers and suppliers that he has worked with in the past is not strictly monitored, there is the potential that he may disclose Plaintiff's Confidential Information.

Accordingly, I find that Plaintiff has shown a substantial likelihood of prevailing on its claims of trade secret misappropriation under the ITSA.

**ii.**    **Whether Plaintiff Will Suffer Immediate and Irreparable Injury**

After a plaintiff shows a likelihood of success on the merits it "must show that it has no adequate remedy at law and, as a result, that it will suffer irreparable harm if the injunction is not issued." *Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). "Inadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Id.*   Additionally, irreparable harm is harm that is "not fully compensated or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction, or both) in the plaintiff's favor." *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013).   "No presumption of irreparable harm attaches upon a showing of likely success on a trade secret claim."  *Aon PLC v. Infinite Equity, Inc.*, 19 C 7504, 2021 WL 4192072, at *25 (N.D. Ill. Sept. 15, 2021).

Plaintiff has stated that its ability to successfully compete depends upon its knowledge of its customer base and using that knowledge to help it work with mills and suppliers to develop long term contracts.  (DE 75 at 167: 15-174:12; 210:24-211:1).  Courts have established that the loss of good will and reputation by way of losing customers or "niche contracts" can constitute irreparable harm. *See Life Spine, Inc.*, 8 F.4th at 546; *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005).  "Th[e] inevitable [future] disclosure of trade secrets [also] supports finding an irreparable harm that cannot be adequately addressed by a legal remedy."  *See Aon PLC*, 19 C 7504, 2021 WL 4192072, at *26.  Thus, I find that Plaintiff has demonstrated irreparable injury.

### iii.   **Whether Plaintiff's Threatened Injury Outweighs Potential Damage to Defendant**

"In balancing the harms, the court must weigh the error of denying a preliminary injunction to the party who would win the case on the merits against the error of granting an injunction to the party who would lose." *See id.* at *29.  When a party establishes a significant likelihood of success on the merits of its claim and that it will suffer irreparable harm, its burden on this element is reduced.  *See id.*

Here, I find that the balance of the harms weighs in favor of granting an injunction restricting the Defendant's contact with customers or entities he did business with while he was performing his duties for Plaintiff.    This conclusion is warranted given Plaintiff's potential likelihood of success on the misappropriation claim under the inevitable disclosure doctrine and its resultant harm. *See id.*  The record does not evidence any harm to Defendant if such a restriction is ordered, and he has already agreed not to engage in this behavior under both the Stipulated Order and the Confidentiality Agreement.  (DE 18 at 2-3; DE 21-1 at 2); *Aon Risk Servs. Companies, Inc. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843, 852 (N.D. Ill. 2019).

Nevertheless, I do not find that enjoining the Defendant from working with TW Metals is warranted.  *See SKF USA, Inc.*, 636 F. Supp. 2d at 716.  While there is a palpable threat of injury, as noted above, Plaintiff has still not alleged that it has lost business to TW Metals in any form. Additionally, notwithstanding the queries of some of its employees, TW Metals has stated that it is committed to complying with Defendant's Confidentiality Agreement.  On the other hand, precluding Defendant from working for one of Plaintiff's direct competitors, or even disrupting his current employment during the instant litigation, has potentially far more serious consequences to the Defendant's career and ongoing ability to earn a living in an industry to which he has

dedicated his professional efforts for more than a quarter-century. *See AutoNation, Inc. v. Mulleavey*, 19-60833-CIV, 2019 WL 4693575, at *5 (S.D. Fla. Aug. 22, 2019). Thus, rather than grant the broad injunction Plaintiff seeks, I find that continuing the Stipulated Order is the most prudent course of action as it maintains the status quo without adverse consequence. *See Aon PLC*, 19 C 7504, 2021 WL 4192072, at *30.

### iv.   Whether the Injunction Would not be Adverse to the Public Interest

For this element, courts must consider "any effects that granting or denying the preliminary injunction would have on nonparties." *See id.* As with the balance of harms, a party's burden under this element is reduced when it establishes a significant likelihood of success on the merits of its claim and that it will suffer irreparable harm. *See id.*

As Plaintiff correctly argues, the public has a significant interest in safeguarding businesses from misappropriation of trade secrets by employees. *See id.* at *31 ("The public interest also favors fair competition . . . that can be achieved without the improper use of confidential information to target a competitor's clients."); *VAS Aero Servs., LLC*, 860 F. Supp. 2d at 1363 ("[P]reliminary injunction would affirmatively serve the public interest by protecting businesses from employees who misappropriate their trade secrets."). Accordingly, while I do not find that enjoining Defendant's employment is warranted, continuation of the Stipulated Order is appropriate and supported under circumstances present here.

### C.   Scope of Relief

I recommend that the Court deny the Motion for Preliminary Injunction to the extent that Plaintiff seeks to enjoin Defendant's employment but grant the Motion for Preliminary Injunction to the extent that Plaintiff seeks to continue the Stipulated Order. There are several reasons for denying the request to enjoin Defendant's employment. Although there is potential merit to

Plaintiff's claims under the inevitable disclosure doctrine, should the Court determine that Illinois law applies, it is noteworthy that courts are "[c]autious in their application of the doctrine." *See Triumph Packaging Group v. Ward*, 834 F. Supp. 2d 796, 809 (N.D. Ill. 2011). Furthermore, Plaintiff has not alleged that Defendant is doing business with specific customers of Plaintiff or directing TW Metals to solicit specific customers of Plaintiff. In fact, Plaintiff has not demonstrated that Defendant is using Confidential Information to compete with Plaintiff in any respect. Therefore, Plaintiff's conjecture about the harm that Defendant's employment with TW Metals will bring does not warrant preventing Defendant from entering into or continuing an employment relationship. In fact, injunctive relief remedies available under the DTSA specifically exclude "prevent[ing] a person from entering into an employment relationship." 18 U.S.C. § 1836(b)(3)(A)(i)(I). Thus, injunctive relief that prohibits Defendant from working for TW Metals or direct competitors of Plaintiff is not available under federal law and may not be warranted under Florida or Illinois law either. *See AutoNation*, 2019 WL 4693575, at *5; *Aon PLC*, 19 C 7504, 2021 WL 4192072, at *30.

Continuation of the Stipulated Order is warranted, however, for multiple reasons. First, Defendant placed himself in the situation of having a potential conflict of interest at the end of his employment tenure with Plaintiff. Defendant continued to engage in activities with Plaintiff that exposed him to significant Confidential Information of Plaintiff after committing to work for TW Metals. This includes, *inter alia*, Defendant's thirty-plus minute conversation with a key material supplier after he resigned from Plaintiff and was placed on suspension. Second, Defendant now works for TW Metals, a company that competes with Plaintiff, and will be helping TW Metals develop its MRO business, a subset of Plaintiff's company where he has significant experience. Third, Defendant has thirteen years of experience with Plaintiff, during which time he held key

executive position and had unfettered access to Plaintiff's Confidential Information. Defendant has also been asked by various employees at TW Metals to divulge some of this Confidential Information. Fourth, although TW Metals has committed to complying with the Confidentiality Agreement, continuation of the Stipulated order will ensure that Defendant will not be solicited by his co-workers and not utilize the Confidential Information he gained while working with Plaintiff. Finally, Defendant has previously consented to a continuation of the Stipulated Order. Thus, I find that extension of the Stipulated Order is justified to prevent the Defendant from breaching his Confidentiality Agreement.

The amount of any injunction bond "lies with the sound discretion of th[e] Court." *VAS Aero Servs., LLC,* 860 F. Supp. 2d at 1364; *Aon PLC*, 19 C 7504, 2021 WL 4192072, at *32. Here, I find that no bond is required for a continuation of the Stipulated Order because it simply continues in force requirements to which Defendant has already been subject.

## CONCLUSION

It is hereby

**ORDERED AND ADJUDGED** that the Clerk of the Court correct the docketing of Plaintiff's Renewed and Expedited Motion for Temporary Restraining Order and Preliminary Injunction (DE 21) to add on CM/ECF the preliminary injunction relief that Plaintiff requests. *See supra* n.1.

Furthermore, for the reasons discussed above, I respectfully **RECOMMEND** that:

1. The Motion for Preliminary Injunction (DE 21) be **GRANTED-IN-PART** to the extent that the motion seeks to continue the Stipulated Order;

2. The Stipulated Order be extended *nunc pro tunc* until two years following the termination of Defendant's employment with Plaintiff;

3.   Plaintiff not be required to post bond;

4.   The Motion for Preliminary Injunction be otherwise **DENIED**.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida on this 26th day of October 2021.

**Jared M. Strauss**
**United States Magistrate Judge**

Copies furnished via CM/ECF to:

Hon. Rodolfo A. Ruiz, II
Counsel of record